57 So.2d 61

### GRIGGS v. BARNES et ux.

#### 4 Div. 668.

Supreme Court of Alabama.

Jan. 3, 1952.

Rehearing Denied March 6, 1952.

Albert L. Patterson, Phenix City, for appellant.

W. R. Belcher and J. W. Brassell, Phenix City, for appellees.

PER CURIAM.

·The case is fully presented in the dissenting opinion of Justice Simpson, *infra*. It is our opinion, however, that under the presumption attending the right of· the natural parent to custody of a child and the lack of evidence of appellant's positive unfitness, she should have been awarded custody in this habeas corpus proceeding.

The decree below is therefore reversed and' one is here rendered to the effect stated, and the cause is remanded to the lower court to carry out the terms of the decree here rendered.

Reversed, rendered and remanded with instructions.

LIVINGSTON, C. J., and FOSTER, LAWSON, STAKELY, and GOODWYN, JJ., concur.

BROWN and SIMPSON, JJ., dissent.

· SIMPSON, Justice (dissenting).

This is an appeal from a decree of the circuit court, in equity, fixing the custodial status of an infant. Stripped of all extraneous matters, the question presented to us is one of fact; that is to say, a determination, from the testimony adduced

on the hearing below, of the best interest of the infant. Since the witnesses gave their testimony orally before the trial judge, who had the advantage of seeing and hearing them testify, this court must perforce approach a review of his findings with this fact in mind.

It appears that complainant, who was sixteen years of age in July, 1950, and unmarried, was found to be pregnant in November of that year, and in April, 1951 gave birth to a boy baby. In a matter of a few hours after the birth the child was placed in the care and custody of the appellees, respondents below. The young mother remained in the hospital only one day. On July 6th, three months after the birth of the baby, the complainant filed this proceeding, praying that custody of the baby be restored to her. The final decree was rendered September 6th and the appeal therefrom was submitted in this court on November 6th.

In substance, the evidence tends to show that the complainant, unaware of her condition, went to the office of Dr. Floyd, a physician, and was examined by Mrs. Floyd, a nurse and assistant in the doctor's office. Complainant was informed by Mrs. Floyd that she was some four or five months pregnant. Complainant was greatly disturbed, and Mrs. Floyd volunteered to take the young woman home and inform complainant's mother of the condition. Without dispute, complainant's mother expressed a desire for the finding of someone to take the baby when it came. There is conflict in the evidence as to the wishes of the complainant. Mrs. Floyd testified that the complainant was exceedingly anxious to conceal her condition from the public, to have the baby and then be relieved of it as quickly and quietly as possible; that the complainant, with the advice and counsel of her mother, agreed to and proceeded with an arrangement whereby she would live in the home of a Mrs. Stone, whose husband was in the Army, until the birth of the child, and then to relinquish to the couple all her rights and claims to the child; that complainant did live for a short time in the home of Mrs. Stone, but Mrs. Stone asked to be relieved of her agreement on account of conduct of the complainant. Complainant left the home of Mrs. Stone and lived at times with her mother and at times with her aunt, by whom she brings this suit. It further appears that complainant was admitted early in the morning of April 6th into the hospital and was delivered of the baby a few hours later. Some hours after the delivery, complainant signed an instrument purporting to give her consent to the adoption of her child, Earl Wendell, by Earsel Barnes and his wife, Anne Lukas Barnes. Complainant never saw the child, who was on the same day given into the custody of the Barnes and carried to their home, where it has been ever since.

On April 12th the Barnes filed a petition for the adoption of the child, in the probate court of Russell County. On May 2nd the complainant executed an instrument purporting to withdraw her consent for adoption of her child and praying for its restoration to her, which instrument was filed in the probate court. Upon the institution of this proceeding in the equity court, the proceeding for adoption in the probate court was stayed.

Much evidence was offered upon the relative fitness of the complainant and of the Barneses to have custody of the child. Interwoven with this evidence, there was much evidence relating to the statutory adoption proceeding, reports and recommendations of the County Department of Public Welfare. For the complainant there was testimony that she at no time, even from the first knowledge of her pregnancy, wished to be separated from her child, but executed the first agreement with the Stones and the subsequent consent to the Barneses only as the result of coercive insistence of her mother, and soon after release from the hospital she started her efforts to regain her child. Aside from the fact that she, an unmarried young woman, gave birth to the child, there is practically no competent evidence derogatory of her character. Upon learning of the adoption proceedings, she executed what is termed the withdrawal of her consent. On the witness stand she testified that the father of her child was Salvadore James Incorvia,

at present in the armed services overseas. According to her, he is a native of Ohio. She testified that she had had letters from him agreeing to marry her when he returned. These letters she did not produce, stating that she had destroyed them. She explained the fact that Incorvia had never sent her any money nor made any allotment for her or the baby by stating that she had not asked him to do so. She stated that she had advanced to the tenth grade in school; that the only work she had ever done was as a waitress, earning as much as eighteen dollars a week; that she had no other training or experience for working and earning a livelihood; that an aunt, a Mrs. McKay, residing in Springfield, Massachusetts, had agreed that complainant bring the child to the home of herself and husband and live with them, the complainant to do the housework and care for the baby while the aunt and husband were at work. She testified that members of her family, including the aunt, would provide means for her to make the journey, and that, when the child was older, she planned to obtain work, but until such time living expenses of herself and child would be borne by the aunt.

By oral testimony and written reports, the director of the County Department of Public Welfare expressed the opinion that complainant was a suitable person to have custody of her child; that the home of the aunt was a suitable and proper place for the complainant and the child; and that, in view of the fact that the complainant, the natural mother of the child, knew the foster parents of her child, lived in the same community with them, wanted the child herself and would pursue her efforts to gain custody and control of her child, the child would not enjoy a desired state of security, but would be subjected to and affected by the conflicting claims for its custody. Communications from the Massachusetts Department of Public Welfare were introduced, giving approval to the McKay home and expressing Mrs. McKay's willingness to aid the complainant and her child by taking them in her home, or to take the complainant alone should she fail to gain full custody of the child.

There was some evidence—that of the complainant alone—that the McKays were financially able to care for complainant and the child.

On the other hand, the evidence is without dispute that the respondents, the Barneses, are substantial people of perhaps middle age and childless and not capacitated to have children of their own; that Barnes operates his own business, owns his home, a house next door, and a business house; that the couple had applied to Mrs. Floyd for a child they might adopt; that they were informed before the birth of the child of complainant that such child would be available to them, and gladly received the baby shortly after its birth. It appears they bore the hospital expense attendant upon the birth of the child, have undergone a sizable outlay in making a special room for the child in their home, and have provided the child with every need, including regular medical attention. The evidence shows that Mrs. Barnes does not work, but personally attends the baby. The application for adoption, declaring a purpose to give the child their name and all the benefits accruing under the laws of adoption, manifests their attitude toward the child. The reports of the County Department of Public Welfare are in all things favorable to the fitness and desirability of the Barneses as adoptive parents, save only the question of the presence of the natural and adoptive parents in the same city, hereinabove mentioned.

The whole evidence, excepting that of the complainant herself, is rather strongly persuasive of the conclusion that the complainant, previous to the time of her execution of her withdrawal of consent for adoption of her child, was concerned alone with the extrication of herself from her very unhappy plight. It appears very clearly that, whatever their intent to aid her, members of complainant's family in the community where she now lives are scarcely able, financially, to do so. Her mother works in a nearby town. There is no indication that she has the intention or the means to be of material assistance. It is uncertain just how much time complainant has lived with her mother. It is

apparent that the mother entertained the firm conviction that the baby should be given for adoption. The mother was not a witness on the hearing. It appears that the father of complainant left his family when she was a small child.

While there is no evidence that the aunt in Massachusetts is presently without unquestioned character, it does appear that she is only twenty-two years of age and was, at the age of sixteen, committed to a state institution—a reform school for girls—as a delinquent.

After hearing the evidence, the trial court reached the conclusion, and so decreed, that the best interest of the child in question would be subserved by leaving the child in the custody of Mr. and Mrs. Barnes, the respondents. Considering that the complainant is now but little more than seventeen years of age, with scant education, background and experience; that the aunt into whose home she proposes to go is herself only twenty-two years of age and, in the absence of any evidence to the contrary, likely in the future to have children of her own; that there is no firm commitment on the part of the aunt or her husband with respect to responsibility on account of the child; that, should the child be placed in the custody of its mother, the complainant, she would be free to go or not to go to Massachusetts, and that if she did take the child to that distant state the child would be removed from the jurisdiction of the Alabama court and its effective supervision: I am not persuaded that the decree appealed from is due to be disturbed. To reiterate, the court below had a distinct advantage in having the witnesses and parties before him and, doubtless, the additional advantage of knowing them and their background.

It is to be borne in mind that we do not have before us any question relating to the adoption proceeding. No decree has been rendered by the probate court. This proceeding was and is incidental to the sole question of proper custody of the child. Moreover, the adoption of a minor child does not affect the power and jurisdiction of a court of equity to make provision for the custody of the child to be awarded to another than the adoptive parent. Praytor v. Cole, 247 Ala. 259, 23 So. 2d 713. A child becomes at once a ward of the court of equity on institution of proceedings to determine the child's custody. Esco v. Davidson, 238 Ala. 653, 193 So. 308. There is no res judicata as respects the custody of an infant, but orders and decrees for care and custody must be kept open for application of equitable and legal principles in the light of the infant's best interest and welfare as the paramount consideration. Rosa v. Underwood, 235 Ala. 447, 179 So. 530; Ex parte State ex rel. McLaughlin, 250 Ala. 579, 35 So.2d 507.

In concluding that the custody of the infant here involved has been properly given to one other than its natural parent, I am not unmindful of the strong presumption which attends the parent in such a contest. Fort v. Fort, 246 Ala. 83, 18 So.2d 870. But in all such cases there is presented the element of the best interest of the child. What is best is rarely a decision easily made. In undertaking the difficult task, courts and judges, aware of their own human limitations but having applied as best they may what of wisdom and conscience they possess, find at least the satisfaction that their decisions, in such matters, are not, like the laws of the Medes and the Persians, irrevocable, but that, so long as the needs and the conditions of the child may require, they may again give consideration to the well-being of the child.

Believing that the decision below is satisfactorily sustained by the evidence and that the best interest of the child dictates its custody be reposed where it is and has been for many months, I respectfully dissent from the holding of the majority.

BROWN, J., concurs.