78 So.2d 910

Barbara Jean GRIGGS

v.

Earsel BARNES et ux.

4 Div. 743.

Supreme Court of Alabama.

March 24, 1955.

358

·Patterson, Patterson & Miller, Phenix City; for appellant.

Mary A. Lee and Samuel Kaufman, Montgomery, for State Dept. of Public Welfare, amicus curiæ, in behalf of appellant.

Brassell & Brassell, Phenix City, for appellees.

MAYFIELD, Justice.

This is the second time that the merits of this cause have been before this court.

On appeal from a writ of habeas corpus from the Circuit Court of Russell County, the Supreme Court of Alabama in Griggs v. Barnes, 257 Ala. 21, 57 So.2d 61, awarded the custody of the minor child, which is the subject of this suit, to his natural mother. This court, in a five to two decision, examined the merits of the controversy between the appellant, Barbara Jean Griggs, the natural mother, and the appellees, Mr. and Mrs. Barnes, the foster parents, and determined that this minor illegitimate child should be returned to its natural mother.

The facts and circumstances upon which this first opinion was based were set out in the dissenting opinion of Mr. Justice Simpson, and must be read in connection with this opinion. The majority of this court in the case of Griggs v. Barnes, supra, mandated the trial court as follows: ·

"* * * the decree of the Circuit Court, in Equity, be reversed and annulled, and this Court proceeding to render the decree that the Circuit Court, in Equity, should have rendered, Doth Order, Adjudge, and Decree that the custody, care, and control, of the minor child, Earl Wendell Griggs, be and the same are hereby awarded to his mother, Barbara Jean Griggs, and the cause is remanded to the Circuit Court, in Equity, with instructions to carry out the terms of the decree here rendered."

In response to this order of the Supreme Court of Alabama, the Circuit Court of Russell County directed the register to order the sheriff to carry out the terms of the decree of this court.

The order of the register to the sheriff was as follows:

"You are hereby commanded to forthwith take into your custody and from the possession of the Respondents, Earsel Barnes and Ann P. Barnes, the minor child, Earl Wendell Griggs, or Earl Wendell Barnes, that is the child by whatever name it is known or called, subject to the habeas corpus proceeding heretofore had between the above said parties, judgment having been rendered in favor of the Plaintiff, Barbara Jean Griggs, for the custody of said child, and against the Respondents, Earsel and Ann P. Barnes, by the Supreme Court of Alabama, on the 6th day of March, 1952, and on the instructions of this Court, * * * the child by any other name which was and is a subject of said proceeding, to be delivered and deliver the same to the possession and custody of the Complainant, Barbara Jean Griggs and make return of this writ and the execution thereof according to law."

This order of the circuit court of Russell County, issued in accordance with the mandate of the Supreme Court of Alabama, was delivered to the sheriff of Russell County, but appears never to have been executed. The custody was never restored to the natural mother. Mr. Barnes was in Phenix City attending to his regular business during this period of time, but was never served with a copy of this order. Anne Barnes testified that she had taken the child out of the State of Alabama to visit relatives in Atlanta, and, therefore, she was never served, and did not surrender the custody of the child as this court ordered. However, a copy of this decree was served by the sheriff upon the attorney of record for the Barneses.

Earsel Barnes and Anne Barnes, with knowledge of the order of this court, filed their petition in the circuit court of Russell County on 12 March 1952, claiming a "change in the condition of the party" since the appeal was taken in the case of Griggs v. Barnes, supra. On the same day that the Barneses, complainants-appellees in the instant cause now before this court, filed their petition for custody, the trial court ordered that the custody of the minor child remain with the complainants upon their entering into bond in the amount of $1,000 "binding them to abide by the terms of any decree entered in this cause, and keep said child within the jurisdiction of this court."

The appellees' failure to surrender this child to its natural mother in accordance with the decrees of court, borders upon a contempt. The Barneses having failed to obey the order of the highest court of this State and the decree of the lower court issued in compliance therewith, now seek recourse to the equity courts of this State. Obviously, they do not come into equity with clean hands.

The "changed conditions" upon which the appellees attempt to retain possession of this child were, as set out in their sworn petition:

"* * * respondent did commit various acts of adultery and fornication. * * * the said Barbara Jean Griggs (the natural mother) has become inebriate to such an extent to almost render her an habitual drunkard and complainants charge for that reason, and because of other immoral conduct as aforesaid, is unfit to have the care, custody and control of said minor child."

The evidence that the Barneses introduced in support of these averments of their petition was of a shabby and uncompelling nature, and insufficient to overcome a well-established rule that the unfitness which deprives a natural parent of its right of custody of a child must be shown by clear, compelling and satisfactory proof. Esco v. Davidson, 238 Ala. 653, 193 So. 308; Fort v. Fort, 246 Ala. 83, 18 So.2d 870.

The principal evidence offered against Barbara Jean Griggs was by way of two Phenix City policemen who were called as witnesses for the complainants below. They testified, in substance, that on the night of the 24th of October, 1951, at about

11:00 p. m., while cruising in their patrol car, they discovered an automobile parked in the vicinity of the Phenix City Water Works. That the respondent, Barbara Jean Griggs, was observed by them in an automobile partially disrobed and in the act of intercourse with a soldier. Neither the background nor the subsequent actions of these Phenix City policemen lend credence to their testimony. These officers contend that Barbara Jean Griggs implored them not to put her in jail, saying that she would have no chance of getting her baby back. The policemen, according to their testimony, then instructed Barbara Jean Griggs and the soldier to meet them at a half hour before midnight at the Central High School and directed that each of them bring $26.50 for a "cash bond". The only reasonable inference that can be drawn from this alleged instruction is, that if each of the accused parties gave the officers $26.50 for a "cash bond", that they would be allowed "to jump their bonds" and that would be the end of this incident.

The Phenix City policemen testified that Barbara Jean Griggs and the soldier met them at the High School just before midnight and stated that they did not have the money; whereupon they were again instructed to meet the officers with the money in the early morning hours, at Mother Mary's Mission. Barbara Jean Griggs and the soldier did not keep this rendezvous. Several days later, one of the officers caused a warrant to be issued to the couple, stating, "so I swore out a warrant myself, because I didn't think it was right to be *cheated* like that, after trying to give her a break, and to ignore me in the *line of duty.*" [Emphasis supplied.] One of the officers testified on cross-examination that he had since been "laid off" of the police force, and was now driving a taxi.

The evidence as to what happened at the trial in the Phenix City Recorder's Court is in sharp conflict. Barbara Jean Griggs strenuously denied her guilt. There was also evidence in the case that the governing officials of Phenix City were over-active in securing a conviction in this case. This claim of the respondent is denied.

It is admitted by appellees that Mrs. Barnes procured a court reporter from the State of Georgia to report this case in the police court and a copy of these proceedings were paid for and delivered to Mrs. Barnes. This criminal prosecution of Barbara Jean Griggs in the Police Court of Phenix City, is now on appeal to the circuit court of Russell County and so far as this court is informed by the record has not been disposed of. The soldier with whom Barbara Jean Griggs allegedly had intercourse was not a witness on the hearing of the petition now before this court. The question of the statements that the soldier made at the Police Court, and also their proper interpretation of these statements, are conflicting. There is evidence that pending the appeal from the Police Court, a responsible official of the City of Phenix City attempted to get Barbara Jean Griggs to sign a "release" admitting the alleged act of intercourse, in order that the city would not be sued for "false arrest". This evidence is denied by the city official.

The complainant below procured the testimony of Barbara Jean Griggs' grandfather, one Lum Griggs. On the question of fitness for custody, this man testified against his granddaughter and in favor of the Barneses. However, the record discloses, without dispute, that this Lum Griggs was an ex-convict who had served time in the penitentiary for larceny. And that he was formerly employed as a bartender at the Yarbrough's Fish Camp, a place of ill repute. Lum Griggs' own son, C. C. Griggs, testified that his father's general reputation in the community in which he lived was bad, and that he could not be believed under oath. The son, C. C. Griggs, went on to testify that his niece Barbara was a hard working girl and enjoyed a good reputation in her community; and that she was in every way the fit and proper person to have the custody and control of her natural child. The record reflects that this character, Lum Griggs, had more than a passing interest in giving his testimony for the complainants. After the trial of the habeas corpus petition in the lower court, Lum Griggs went to the office of Barbara Jean's attorney, A. L. Patterson, and

threatened that if Mr. Patterson pursued Barbara Jean Griggs' appeal in Griggs v. Barnes, supra, that he would run his granddaughter out of town.

The charge that. appellant "became inebriate to such an extent as to almost render her an habitual drunkard", is not supported by the evidence. In fact, the great preponderance of the evidence indicates that Barbara Jean Griggs was a total abstainer. The Barnes' principal witness on this issue was partially discredited on cross-examination, and while under examination was taken with some sort of seizure, and was unable to finish her cross-examination. This woman had formerly been a licensee of the State Department of Welfare to care for small children under the control of that Department. The State refused to renew her license. The report of the State Department of Welfare, introduced into the evidence, supports the claim of the natural mother.

█ The evidence in this cause was voluminous and a great deal of it was directed in general terms to the overall fitness of the contending parties. This issue had already been determined by the Supreme Court of Alabama and the evidence should have been limited to the alleged "changed conditions" set out in the sworn petition of the complainants below.

It might be observed that the State Department of Welfare caused an independent investigation to be made of this cause. This report was introduced into evidence. In an excellent brief which the Department directed its able solicitor to file, Amicus Curiæ, this point was made:

" * * * No evidence was introduced that she has pursued any extra legal method of securing custody of her child, though she has consistently and unswervingly pursued legal channels. On the other hand, it may appear that the path pursued by the foster parents in this case reflects a determined, possessive drive to keep the child at any cost. One questions whether such a drive is indicative of that quality of parental love, which a child needs.

"The State Department of Public Welfare submits there is some question as to whether these foster parents are free of a smothering, possessive type of love. In any event, the State Department of Public Welfare submits that the natural mother is entitled to the care and custody of her child, and that the best interest of this child will be preserved by his being placed in the custody of his natural mother."

There was considerable evidence that Mr. Barnes drank to excess. This fact was established not only by the testimony of the respondent's witnesses but confirmed by the admissions of the complainants' witnesses on cross-examination, and substantiated by convictions in the Police Court. It should be observed in justice to Mr. Barnes, however, that no evidence was elicited which clearly showed that his excessive drinking was done in the presence of this child, or had any detrimental effect upon the child which he sought to adopt.

The record without dispute shows that Mrs. Barnes was a woman of exemplary character and deeply devoted to Barbara Jean Griggs' child.

We are mindful of the passionate and burning desire of couples who have been denied parenthood to give stability and meaning to their lives by the adoption of children. We also recognize that once a helpless babe is brought into a home, nurtured and cared for by its foster parents, that the tenderness and the depth of the bond between the infant and its benefactors increases with each passing day. We can say without hesitation that the attachment of these foster parents is now as deep as if this child were flesh of their flesh and blood of their blood.

These natural and human feelings of the foster parents, however, cannot be allowed to sway us from our sworn and bounden duty to enforce the laws of this state. No legal adoption of Barbara Jean Griggs' child was consummated by the Barneses.

█ While it is true that the "pole star" in custody cases is the best interest and

welfare of the child, the courts of this state do not have the power to sever the bonds of blood relationship merely in order to gain some real or fancied advantage for a minor child.

In the instant case, this unwed mother was delivered of her baby in the early morning hours of 6 April 1951. A few hours after she had given life to this child, she signed an instrument purporting to consent to his adoption. Mrs. Floyd, a nurse and assistant to her husband, the mother's physician, was active in the arrangement of the placement of this child in a foster home. It is not shown that either Mrs. Floyd or Dr. Floyd were licensed under the laws of this state to engage in the practice of placing children. The practice of the unauthorized placement of children has been under heavy attack in this and other states by the duly constituted agencies and authorities of the state and by the bar associations.

As late as July, 1954, the Alabama Bar Association adopted a resolution deploring the unauthorized placement of children which reads in part as follows:

"Resolved, that the Alabama State Bar Association recommends (1) that all county bar associations carefully scrutinize, in relation to Title 49, Sections 62, 67 and 78, and Title 27, Sections 3 and 7, Code of Alabama 1940, the practice of signing blank consent forms and the placement of referral of children for adoption by unauthorized individuals or agencies; and (2) that individual attorneys use their influence to acquaint the public in addition to their clients to whom they provide professional service with the legal procedures of adoption designed to protect children, natural parents and foster parents; * * *"

Upon regaining her health, Barbara Jean Griggs realized that she could not live with the decision that she had made to give up her baby. On 2 May 1954, she executed an instrument for the purpose of withdrawing her consent to the adoption of her child and praying that the child be restored to her.

From that date to the present, with the meager resources at her command, she has waged an unceasing battle to recover possession of her child.

The very right of this struggle has already been determined by this court and it will serve no useful purpose to further enumerate the heart rending claims and counter claims that were brought forth in the first trial of this cause. The only thing now open for our examination is whether or not, since the rendition of the first decree, the appellant so comported herself that the custody vested in her by the Supreme Court of Alabama should be revoked in the best interests of her child. The evidence adduced at this trial falls far short of the quantum of proof necessary to overcome the strong presumption that the law indulges in her favor.

This teen-aged mother, misguided though she was, carried this child, and gave of herself to complete her pregnancy. Alone, disgraced and afraid, she entered the twilight valley of the shadow of death to bring life to this child. Her right to this child is paramount. The natural parents, and in the case of illegitimate children, the natural mother, is entitled to the care and custody of her children, unless good cause is shown why the custody of the natural parent is not in the best interest of the child. Griggs v. Barnes, supra, Morris v. Morris, 19 Ala.App. 216, 96 So. 374, see also Stoddard v. Bruner, 217 Ala. 207, 115 So. 252; Chandler v. Whatley, 238 Ala. 206, 189 So. 751; Fort v. Fort, 246 Ala. 83, 18 So.2d 870; Sparkman v. Sparkman, 217 Ala. 41, 114 So. 580; Cordell v. Cordell, 233 Ala. 114, 170 So. 218; Whitten v. Whitten, 214 Ala. 653, 108 So. 751.

The evidence in this cause was voluminous, and we do not wish to be understood that this opinion recites all of the evidence upon which this decision is based. Much of the evidence was in general terms and was directed to the overall fitness of the contending parties. Much of the evidence was of doubtful admissibility, and some of the procedures and methods of introduction of evidence were at the least irregular.

For example, we are informed through the record without denial, that after the Supreme Court of Alabama awarded custody to the natural mother that she found a husband and is now married to a member of the Armed Forces of the United States. We can only wish that this evidence was clearer and that it had filtered into the record in a more admissible form. As this is a circumstance to which the court should give due consideration.

■ The rule that the decree of the nisi prius court should be given the effect of a jury verdict when the evidence was heard ore tenus, is without application where the trial court erroneously applied the law to the facts before him. Here the learned Chancellor's decree seems to be based solely on what he considered the best interest of the minor child without adequate regard to the legal rights of the natural mother due to her blood relationship.

The problem has been best stated in the classic California case, In Guardianship of Smith Howes v. Cohen, Cal., 255 P.2d 761, 762:

"* * * It has been held repeatedly that, while the best interests of an illegitimate child is the important factor, the parents of such a child have a superior claim as against the world to his custody if they are fit and proper. Armstrong v. Price, Mo.App., 292 S.W. 447, mother; Jensen v. Earley, 63 Utah 604, 228 P. 217, mother; In re Gille, supra, 65 Cal.App. 617, 224 P. 784, mother; Ex parte Wallace, 26 N.M. 181, 190 P. 1020, father; Garrett v. Mahaley, 199 Ala. 606, 75 So. 10, father; Lewis v. Crowell, 210 Ala. 199, 97 So. 691, father; People ex rel. Meredith v. Meredith, supra, 272 App. Div. 79, 69 N.Y.S.2d 462, affirmed 297 N.Y. 692, 77 N.E.2d 8; State v. Nestaval, 72 Minn. 415, 75 N.W. 725; Jackson v. Luckie, 205 Ga. 100, 52 S.E. 2d 588; Ex parte Schwartzkopf, 149 Neb. 460, 31 N.W.2d 294; Ex parte Malley, 131 N.J.Eq. 404, 25 A.2d 630; French v. Catholic Community League, 69 Ohio App. 442, 44 N.E.2d 113; Com. ex rel. Human v. Hyman, 164 Pa.Super.

64, 63 A.2d 447; Templeton v. Walker, Tex.Civ.App., 179 S.W.2d 811; Henderson v. Henderson, 187 Va. 121, 46 S.E.2d 10; Petition of Dickholtz, 341 Ill.App. 400, 94 N.E.2d 89; 7 Am.Jur., Bastards, §§ 61–66; 10 C.J.S., Bastards, § 17; Pierce v. Jeffries, 103 W.Va. 410, 137 S.E. 651, 51 A.L.R. [1502] 1507. The same rule has been applied with respect to the custody of legitimate children. Civ.Code, § 197; Roche v. Roche, 25 Cal.2d 141, 152 P.2d 999; Stever v. Stever, 6 Cal.2d 166, 56 P.2d 1229; cases cited 13 Cal.Jur. 153–5. It is further held in those cases that as between a parent and a stranger the custody cannot be awarded to the latter unless the parent is found to be unfit and improper as custodian. This is in line with the principle that 'The essence of custody is the companionship of the child and the right to make decisions regarding his care and control, education, health, and religion', Lerner v. Superior Court, 38 Cal.2d 676, 681, 242 P.2d 321, 323, and 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, supra. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter', Prince v. [Com. of] Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, and 'For the welfare of his Ideal Commonwealth, Plato suggested a law which should provide: "That the wives of our guardians are to be common, and their children are to be common, and no parent is to know his own child, nor any child his parent. * * * The proper officers will take the offspring of the good parents to the pen or fold, and there they will deposit them with certain nurses who dwell in a separate quarter; but the offspring of the inferior, or of the better when they chance to be deformed, will be put away

in some mysterious, unknown place, as they should be." In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius their ideas touching the relation between individual and state were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any Legislature could impose such restrictions upon the people of a state without doing violence to both letter and spirit of the Constitution.' *Meyer v. [State of] Nebraska,* 262 U.S. 390, 401, 43 S.Ct. 625, 627, 67 L.Ed. 1042. Hence extreme caution must be observed in depriving a parent of the custody of his child. If he is fit, the child should not be taken from him by vague applications of the concept that the best interests of the child come first. Otherwise there is no limit to the extent courts may go. They may base parental deprivation of custody on what they consider better financial or social standing, educational background, nationality, race, or religion, etc., although the fitness of the parent is apparent. Merely because some other person may be more fit should not be a basis for defeating the parent's natural right. If without finding the parent unfit the general conclusion is reached that the best interests of the child require that a stranger be his custodian, the necessary hypothesis is that although the parent was fit, the court decided someone else was more fit. That means that the state acting through its courts may completely eliminate all parental rights. * * *"

And as was said in our case of *Esco v. Davidson,* 238 Ala. 653, 655, 193 So. 308, 309:

" 'The unfitness which deprives the parent of the right of the custody of a child must be *positive,* and not *merely comparative* or *speculative,* and must be shown by *clear* and *satisfactory* proof, the burden of proof being on the person contesting the parent's right to the custody. * * *' "

We do not find that the averments of appellees' petition are supported by evidence that is either clear, satisfactory or compelling, and further that the evidence that was offered was insufficient to overcome the burden of proof cast upon appellees in their attempt to deprive the natural mother of her child.

The decree of the lower court is again reversed and one is here rendered to the effect that the appellant is entitled to the custody of her minor child. To this end, this cause is again remanded to the Circuit Court of Russell County with instructions to forthwith carry out the terms of the decree here rendered.

Reversed, rendered and remanded with instructions.

LIVINGSTON, C. J., and GOODWYN, J., concur in the result.

SIMPSON, J., concurs specially.

SIMPSON, Justice (concurring specially).

While still adhering to my dissent in the first case cited supra, I perforce must respectfully bow to the decision of the majority. With this preface I concur in the instant opinion that no sufficient change in conditions have been made to appear to justify modification of the former decree.