CRAWLEY, Judge,
dissenting.
I must respectfully dissent. I would reverse the judgment of the trial court because the evidence does not support its finding of unfitness.
Ex parte Terry sets out the standard the trial court must use in deciding a custody dispute between a parent and nonparents:
“ ‘The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by [dear and convincing][1] evidence, that the parent seeking custody is guilty of ... misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.’ ”
Ex parte Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)). That the father is seeking custody of a child born out of wedlock does not affect the parental presumption. Ex parte D.J., 645 So.2d 303, 306 (Ala.1994).
The trial court’s order states that it found from clear and convincing evidence that the father was unfit. Although it indicates that its decision was based on several other unspecified factors, the trial court dedicates two pages of its order to stating that it does not believe that the father did not know that the child was his and that the father had made no effort to contribute to the “financial, spiritual, emotional, moral or physical [well-being of the child] under the guise that he did not know [the child was his].” I cannot agree that the father’s failure to pursue paternity testing on his own or his lack of contribution to the “financial, spiritual, emotional, moral or physical [well-being of the child]” makes him unfit. In fact, the basis of trial court’s decision appears to run counter to our supreme court’s opinion in Ex parte D.J., 645 So.2d 303, 306 (Ala.1994), in which the supreme court clearly stated that the parental presumption of Ex parte Terry had long been extended to fathers of illegitimate children. See Lewis v. Crowell, 210 Ala. 199, 200, 97 So. 691, 692 (1923), and Griggs v. Barnes, 262 Ala. 357, 78 So.2d 910 (1955).
The supreme court has held:
“[I]n a custody contest between a nonpar-ent and one who has been adjudicated the father of a child born out of wedlock, the father is entitled to the presumption that the child’s best interests will best be served by an award of custody to him, subject to the absence of a finding that he is unfit....”
Ex parte D.J., 645 So.2d at 306 (emphasis added). The father in this case had no right to the custody of this child, and consequently, no responsibility for her, until paternity was established. Only after a determination of paternity had been made was the father subjected to the “obligations for the care, maintenance, and education of the child [such] as are imposed upon fathers of legitimate children.” Keener v. State, 347 So.2d 398, 401 (Ala.1977); see also Ex parte University of South Alabama, 541 So.2d 535, 540 (Ala.1989) (Maddox, J., dissenting).
The majority states that the parental presumption set out in Ex parte Terry does not apply to the father because he avoided his responsibility for his child. Under the law, the father had no legal responsibility for the child, so he could not have “avoided” that responsibility. Judge Thompson, in State ex rel. T.L.K. v. T.K., 723 So.2d 69 (Ala.Civ.App.1998) (quoting Ex parte State of California, *201 669 So.2d 884, 885 (Ala.1995)), stated: “No duty of support arises from a mere presumption of paternity; ‘paternity must be established before a court determines whether child support is owed.’” If no duty arises from a statutory presumption of parenthood, surely no duty arises from a rumor of parenthood. As our supreme court has clearly stated, paternity must be established. See Ex parte State of California, 669 So.2d 884, 885 (Ala.1995). Nothing in Ex parte Terry or Ex parte D.J. carves out an exception to the parental presumption. The Ex parte Terry standard applies to the father of a child born out of wedlock. In fact, our supreme court has stated:
“Moreover, no reason appears why a natural father [of a child born out of wedlock] should not be presumed susceptible of the same paternal affection and nurturing tendencies as fathers of children born within the bonds of marriage. Indeed, the application of the parental presumption in such cases promotes the sound policy of encouraging fathers to fulfill their paternal roles.”
Ex parte D.J., 645 So.2d at 306 (emphasis added). “Susceptible” is defined as “capable of submitting to an action” and “open, subject, or unresistant to some stimulus, influence, or agency.” Merriam Webster’s Collegiate Dictionary 1187 (10th ed.1997). In my opinion, it makes little difference that the father did not show an interest in a child that was not yet judicially determined to be his; he is entitled to the presumption that, as a father who has recently been adjudicated the father of a child, he will act in accordance with the feelings evoked by his new-found fatherhood.
Judge Monroe, in his special concurrence, makes an argument similar to the majority’s; that is, he states that the father forfeited his rights to the child because he abandoned the child. To abandon a child, a parent must have a right and an obligation to that child. The father was not the child’s legal parent until he was adjudicated the father, and, before the adjudication, he was not subject to the “obligations for the care, maintenance, and education of the child [such] as are imposed upon fathers of legitimate children.” Keener, 347 So.2d at 401; see also Ex parte University of South Alabama, 541 So.2d at 540 (Maddox, J., dissenting).
As for the majority’s argument that the father is not entitled to the parental presumption because he has avoided “his moral duty to provide support for his child,” 721 So.2d at 198, it fails because “ ‘[i]n the absence of a legal duty, the breach of a moral duty does not suffice to invest ... liability.’ ” Hathcock v. Hathcock, 685 So.2d 736, 738 (Ala.Civ.App.1996) (quoting Handley v. Richards, 518 So.2d 682, 686 (Ala.1987) (Maddox, J., concurring specially)). Certainly, parents have certain moral obligations to their children. See Hathcock, 685 So.2d at 738. However, all “moral obligations ... are not legally enforceable duties.” Id. “The law does not mirror all prevailing moral standards,” id., and this court cannot enforce every moral obligation, because it is bound by the law.
The true issue in this case is whether the trial court’s finding of unfitness is supported by clear and convincing evidence, as required by Ex parte Terry. See Ex parte Terry, 494 So.2d at 632; Ex parte Berryhill, 410 So.2d 416, 417 (Ala.1982).
“ ‘Clear and convincing evidence is most easily defined as the evidentiary standard that lies somewhere between a preponderance of the evidence and evidence probative beyond a reasonable doubt.’ The standard has been explained as that evidence which convinces the trier of fact that a proposition is ‘highly probable,’ as distinguished from ‘more probable than not.’
“ ‘Clear and convincing proof is not necessarily undisputed proof.’ ‘The clear ... and convincing standard’ is met when the court is ‘... clearly convinced of the affirmative of the proposition to be proved.’ This does not mean that there may not be ‘contrary evidence.’ ‘ “[C]onvincing” evidence by definition requires a weighing of the evidence.’ ”
D.D.P. v. State, 595 So.2d 528, 538 (Ala.Crim.App.1991) (citations omitted). Although I recognize that the trial court’s decision is presumed correct under the ore tenus standard and cannot be reversed unless it is so unsupported by the evidence as to be plainly *202 and palpably wrong, Godwin v. Bogart, 674 So.2d 606, 610 (Ala.Civ.App.1995), I do not believe the trial court’s decision is supported by the appropriate quantum of evidence. Other than the trial court’s obvious determination that the father shirked a responsibility he did not have, I can find no basis for a finding of unfitness.
The mother testified that the child was conceived of a one-time sexual encounter. According to the mother, she and the father “dated” for six to eight weeks in 1989 before she learned that she was pregnant. She testified that she told the father of the pregnancy immediately, but she says that he denied paternity. She further testified that she knows that the father drinks alcohol and smokes marijuana. However, on further examination, she admitted that she had seen him smoke marijuana only a “couple of times” since they had stopped “dating.” She also testified that the child told her that she saw the father “roll[ ] up a cigarette.”
The grandmother testified that the child had indicated to her that she did not want to live with her father. According to the grandmother, the child complained about the six-foot fence around the father’s house and told her that at the father’s home she had to sleep on a beanbag chair. The grandmother recounted an incident where the child came home with a note to the grandmother tucked into her shoe. According to the grandmother, the child told her that she had to sneak the note out of the father’s house because the father’s wife, A.C., took another note she was writing away from her. The grandmother stated that the child could not be happy in the father’s home.
The father testified that he is now married and has two sons by his wife. He said that their family also includes his wife’s son by another man. He testified that he and his wife want to incorporate the child into their family; she would be the only daughter. The father denied that the mother had ever told him before the paternity action was filed that the child was his. He did admit that he had heard rumors that he was the father, but he said that he did nothing to determine if the rumors were true. According to him, the encounter with the mother was a one-night stand. The father candidly admitted that he drinks beer on occasion, sometimes in the evening when he arrives home from work and sometimes on weekends. He denied that he presently smokes marijuana; however, he admitted that in the past, until about five years before, he did smoke marijuana. He testified that the child did not seem miserable while at his home. He testified that the child sometimes slept in the top bunk bed in the boys’ room and that she sometimes slept on the fold-out couch. He further testified that he and his wife sometimes gave up their bed for her to sleep in. He said that he was considering adding a room for the child or possibly buying a larger home.
The father’s wife testified that two of her children had suffered from lead poisoning. According to her, the lead poisoning was discovered during a routine health screening. The wife testified that they discovered that the house they live in had been painted with lead-based paint and that the kitchen had lead pipes. She further testified that she and the father have done extensive remodeling and that the remodeling of the inside of the house had been completed. However, she admitted that the repainting of the exterior of the house had not yet been completed. She testified that the house has two bedrooms. According to her, her children sleep in one bedroom and she and the father sleep in the other. However, she testified that she and the father had allowed the child to sleep in their room while they slept on a fold-out couch. When questioned about the child’s report that she had to sleep on a beanbag chair, the father’s wife testified that the child had asked to sleep on that chair one night. She further testified that neither she nor the father smokes marijuana. She also testified that the father does drink beer. She denied that the father has ever hit her or abused her.
K.E.H., a neighbor of the grandmother, testified that her daughter and the child were friends. The neighbor testified that she had picked up and dropped off the child at the father’s home while he had custody. According to her, the child had indicated that she wanted to go back to her grandmother’s house. She also stated that the child had *203 said she was planning to run away from her father’s house.
The mother’s common-law husband, M.C., testified that he worked at a Jack’s restaurant in 1993 or 1994 with the father’s wife. According to him, the father’s wife came to work one day with a black eye, with a “busted lip,” and with her arm in a sling. He stated that she told him the father had beat her up.
The child testified in chambers. When asked by the court whether she would rather stay with her grandparents, she answered yes. The court asked if her father drank every night, and she answered no. She also told the court no when it asked her if the father ever got drunk or passed out.
I have reviewed the testimony, but I have found no clear and convincing evidence that the father is unfit. That is, I found no “evidence [that] convinces [me] that [the father’s unfitness] is ‘highly probable,’ as distinguished from ‘more probable than not.’ ” D.D.P., 595 So.2d at 538. At worst, the facts . establish that the father might have physically assaulted his wife one time three or four years ago, that he drinks beer after work and on weekends, and that he may, according to the mother, have smoked marijuana “a couple of times” in the past five years. The fact that the father’s two sons suffered from lead poisoning does not indicate a lack of care by the father and his wife; in fact, the father and his wife both testified that they took on, and have nearly completed, the task of remodeling to remove lead contaminates from the home. The father’s home is small, but he and his wife testified that they can make arrangements for the child to have a place to sleep. The father even testified that he would consider adding another room or purchasing a larger house. None of the evidence supports a finding that the father “ ‘is guilty of ... misconduct or neglect to a degree which renders [him] an unfit and improper person to be entrusted with the care and upbringing of the child.’ ” Ex parte Terry, 494 So.2d at 632 (citation omitted).
In light of the parental presumption explained in Ex parte Terry, and because the trial court’s finding of unfitness is not supported by clear and convincing evidence, I would reverse the trial court’s judgment.

. I have replaced the word "competent,” which actually appears in the text quoted from Ex parte Terry, with the words "clear and convincing" because Ex parte Berryhill, 410 So.2d 416, 417 (Ala.1982), upon which the Ex parte Terry decision is based, requires clear and convincing evidence of the unfitness of a parent before the parental presumption may be overcome. See also Chandler v. Whatley, 238 Ala. 206, 209, 189 So. 751, 754 (1939). In Ex parte Terry, the supreme court expressly stated that "[t]he standard to be applied in this case is that applied by this Court in Ex parte Berryhill.” Ex parte Terry, 494 So.2d at 632.