Florence Faye Horn ("the mother") and Clifton Reed Horn ("the father") married in May 1992. They had five children before they separated in May 2000. When the father left the mother, she was unemployed and destitute. She moved in with her mother, Gloria Wyatt ("the grandmother"), and her adoptive father, Jessie Wyatt ("the grandfather") (referred to collectively as "the grandparents"). The mother began to suffer from depression because of the collapse of her marriage; as a result, she sought inpatient treatment in August or September 2001[1] at Meadhaven, a treatment facility that offers, among other things, emotional-health counseling, and Griel Memorial Psychiatric Hospital. According to the mother's pleadings, the grandparents voluntarily cared for the children during her treatment. The mother was released from treatment on September 26, 2001. The record does not reflect whether the mother returned to live with the grandparents and the children at that time. *Page 1199 
However, the mother's pleadings indicate that, on November 12, 2001, she informed the grandparents that she had made alternative living arrangements and that she planned to take the children with her. The grandparents refused to let her take the children; when the mother sought the aid of law enforcement, she was informed that she could take the children with her because the grandparents did not have custody. The mother attempted to take her three daughters home from school on November 13; however, the grandparents had instructed the school not to allow her to take the children. Only after law-enforcement officers arrived at the school was the mother permitted to leave with the children. The sons, who attended a different school, remained in the custody of the grandparents. The grandparents then filed a petition for involuntary commitment of the mother, which resulted in the mother being picked up by officers of the Elmore County sheriff's department on November 16, 2001, and being detained over the weekend in the Elmore County jail. The grandparents took custody of the three daughters while the mother was detained. After a hearing on November 19, 2001, the probate court denied the petition.
The mother filed for a divorce from the father in late November 2001, alleging, among other things, that the father had been physically abusive during the marriage. She stayed briefly with her biological father in the early part of December 2001, and then, after having another assessment at Meadhaven at the request of a local women's shelter, she began living at the shelter. The grandparents intervened in the divorce action, seeking custody of the children. Pursuant to an agreement of the parties, the trial court awarded the grandparents temporary custody of the children in December 2001. The divorce proceeded to trial on August 5, 2002.
The trial court awarded custody of the children to the grandparents. In its judgment, the trial court determined that the mother was unfit. As a basis for this finding, the trial court noted that the mother had suffered and would continue to suffer from depression, had no driver's license or vehicle, relied on friends for transportation to her job as a housekeeper at a motel, made $6.00 per hour, and received approximately $130 in food stamps per month. The judgment also stated that "[w]hile the [mother] has been treated at mental institutions for her depression, she has made serious efforts in improving her lifestyle and the Court commends her on the efforts she is making to change her lifestyle." The mother appeals the judgment, arguing that the trial court's finding of unfitness is not supported by the evidence.
As noted in the judgment, the mother has been employed as a housekeeper at a motel in Montgomery since late February 2002. She earns $6.00 per hour and works approximately 30 to 35 hours per week. She is considered a part-time employee and receives no employee benefits. She routinely receives a ride to her job from a friend. Since June 2002, she has lived in a house in Tallassee, Alabama; the house has three bedrooms and one bath. The mother also testified that she sometimes cleans houses on the side to make extra money or to trade for other services (for example, for rides to work or for babysitting).
The mother testified that she had voluntarily sought treatment for her depression in September 2001. She said that she had been prescribed medication for depression, but she had not taken it for several months. She said that her situation had improved after she started her job and moved from the women's shelter into her *Page 1200 
own home. She said that she felt like herself again. She also said that, were she to have feelings of depression or anxiety in the future, she would seek counseling either at the Family Guidance Center or the Center for Families.
When questioned about what she, who admittedly does not have a driver's license or a vehicle, would do if she had an emergency with one of the children, the mother replied that she would dial 911 for emergency assistance if necessary or that she would seek help from her neighbors who had assisted her with transportation in the past. She explained that she had investigated the school system in Tallassee, and she noted that the system had several programs for both gifted students and special-education students. She also explained that, while she did not have insurance coverage available through her employer, she thought that she might qualify for Medicaid and that she had investigated the possibility of having the children covered under AllKids, a state-sponsored children's health-insurance program that provides coverage for little or no cost.
The mother testified that she was aware that one of her children might need special-education classes and that another one of her children might have special emotional needs that would require counseling. She testified that she would find a way to ensure that her children received any counseling they might need. The mother said that she had "thought and thought and planned and planned" about what she would need if she were to be awarded custody of her five children. She said she had researched the school system, its programs, and even counseling options, so that she would be prepared. Although she admitted that it would not be easy, she said that she felt that she could rear her children.
Although she noted the improvements the mother had made in the year before trial, the grandmother testified that she did not think that the mother was ready to take custody of the children. When questioned about whether, in the past, she had doubted the mother's ability to care for the children, the grandmother commented that the mother "didn't quite have it together then, but I see now that she does have it together a little bit more." She said that the mother had not always "taken care" of the children because of her depression, noting, "I guess the depression caused her not to think straight." The grandmother did not explain in detail the basis for her belief that the mother had failed to "take care" of the children.
The grandmother explained that the children — Dustin, age 11; twins Hope and Faith, age 8; Anna, age 7; and Tyson, age 5 — all had problems with their teeth; those problems varied from minor problems to more extensive problems that resulted in having teeth removed. However, the grandmother did not provide detailed testimony concerning the specific problems or of the likely cause of those problems. The mother, when questioned by the court about whether the children had been to see any doctors or dentists, commented that she had asked her lawyer to suggest to the grandparents that the children be taken to a dentist. We also note that the children and the mother lived with the grandparents from May 2000 until the mother entered treatment in September 2001 and that the children remained under the grandparents' care between September 2001 and December 2001, when the grandparents were awarded temporary custody; as far as we can tell from the record, the children's dental problems went undetected and untreated during that period.
The grandmother said that the sons, Dustin and Tyson, were very smart and *Page 1201 
would be in classes for gifted children at school. She said that Faith was also smart. Faith's twin sister, Hope, however, according to the grandmother, is enrolled in special-education classes. Anna, the youngest daughter, has been diagnosed with bipolar disorder and is on medication. The grandmother stated that Tyson, the youngest son, had recently begun acting similarly to the way Anna had behaved before she was diagnosed with bipolar disorder, and the grandmother said that she thought that Tyson should be evaluated to determine whether he also suffers from bipolar disorder.
The grandmother does not have a driver's license, but the grandfather does. He testified that he is employed by Bradley Plumbing, and he said that, if the grandmother needed him to drive the children somewhere, his work schedule was flexible and would allow him to come home if necessary. The children are presently on his insurance plan and have been since shortly after the grandparents were awarded custody of the children in December 2001. The trial court had ordered the grandfather to attend an anger-management program. Although the grandfather claimed that he had not completed the program at the time of trial because he had encountered some financial difficulties and because his inability to read hindered his progress, he stated that he planned to complete the program. The grandfather said that the mother was "doing pretty good," but he did not believe that she was ready to rear her five children on her own.
 "In a custody dispute between a parent and a nonparent, the parent has a prima facie right to custody of his or her child. Ex parte D.J., 645 So.2d 303 (Ala. 1994). Unless the trial court finds that the parent is unfit, or that the parent has voluntarily relinquished custody of the child, or that the parent has lost custody of the child by virtue of a prior order, the law presumes that the best interests of the child will be served by giving the parent custody. Ex parte Terry, 494 So.2d 628
(Ala. 1986); Ex parte Mathews, 428 So.2d 58 (Ala. 1983); E.C.B. v. J.S., 612 So.2d 1243
(Ala.Civ.App. 1992); Roden v. Colburn, 522 So.2d 290
(Ala.Civ.App. 1988)."
D.P.M. v. D.B., 669 So.2d 191, 193 (Ala.Civ.App. 1995). The grant of pendente lite custody to the grandparents in December 2001 was not considered a loss of custody that would overcome the presumption in favor of the mother. See D.P.M.,669 So.2d at 194 ("It is well settled that a pendente lite order changing custody does not shift the burden of meeting the [Ex parte]McLendon[, 455 So.2d 863 (Ala. 1984),] standard to the parent who temporarily loses custody by virtue of that order." (citingT.L.L. v. T.F.L., Jr., 580 So.2d 1359 (Ala.Civ.App. 1991);Sims v. Sims, 515 So.2d 1 (Ala.Civ.App. 1987))). Nor does the fact that the mother and the grandparents agreed that the grandparents would care for the children while the mother sought inpatient treatment for her depression in September 2001 overcome the presumption in favor of the mother on the basis that the mother "voluntarily relinquished" custody.
 "Both `[t]his court and our Supreme Court have encouraged custodial arrangements during necessitous times.' M.D.K. v. V.M., 647 So.2d 764, 765
(Ala.Civ.App. 1994). We have recognized that a parent who `enlist[s] the aid of [grandparents] to care for the child during difficult times' should not be deemed to have `voluntarily relinquished' custody, because
 "`[t]o allow a grandparent to argue that this set of facts supports a finding that a parent voluntarily relinquished custody of a child would *Page 1202 
promote family discord and would discourage parents from seeking assistance from grandparents to insure that the children have adequate care.'
"M.D.K. v. V.M., 647 So.2d at 765."
D.P.M., 669 So.2d at 194.
Therefore, the only basis upon which the trial court could have awarded custody of the children to the grandparents was its finding that the mother was unfit. That finding of unfitness must be supported by clear and convincing evidence.[2] Ex parteBerryhill, 410 So.2d 416, 417 (Ala. 1982); Ex parte Sullivan,407 So.2d 559, 563 (Ala. 1981); see also Griggs v. Barnes,262 Ala. 357, 364, 78 So.2d 910, 917 (1955) ("`"The unfitness which deprives the parent of the right to the custody of a child must be positive, and not merely comparative or speculative, and must be shown by clear and satisfactory proof."'" (quotingEsco v. Davidson, 238 Ala. 653, 655, 193 So. 308, 309 (1940) (quoting in turn, 46 Corpus Juris, p. 1243))). The mother argues that the grandparents did not present clear and convincing evidence of her unfitness. We agree.
The evidence produced at the trial indicated that the mother was struggling financially, that she had no driver's license and no vehicle, that some of her children have special needs, and that the children have some unspecified dental problems that have resulted in their having some teeth removed. Although a parent's neglect of her children's health is a factor to be considered when determining that parent's fitness, J.W. v. D.W.,835 So.2d 206, 211 (Ala.Civ.App. 2002) (affirming an award of custody to the grandparents when the mother had an unkempt home, had behaved irresponsibly by taking her child with her to parties at which alcohol was consumed, had spent an "`inordinate amount of time on the Internet leaving the minor child unattended,'" and had failed to provide the child with necessary dental care, which resulted in a need for extensive dental work on a three-year-old child), we note that the children and the mother lived with the grandparents from May 2000 until September 2001, that from September 2001 to December 2001, the children were cared for solely by the grandparents, and that the children were not taken for any dental treatment until after the grandparents were awarded temporary custody in December 2001. The grandmother testified at trial that the children were not taken to any health-care professional until after the grandparents obtained insurance coverage for the children, presumably because the cost of any health care would have been more than the grandparents could or would pay. The mother, having been abandoned by her husband and having no employment at that time, presumably had no health insurance of her own, and also would have found it difficult to pay for dental treatment *Page 1203 
for five children. Since the children were in the home of the grandparents for approximately 20 months before they received dental treatment for what the grandmother characterized, in some cases, as rather severe problems, we find it rather disingenuous for the grandparents to argue that the failure to remedy the children's dental problems should be laid solely at the feet of the mother without some evidence that the grandparents, like the grandmother in J.W., had urged the mother to remedy those emerging dental problems.
We do not find clear and convincing evidence of the mother's unfitness in this record. At most, we find evidence that the grandparents, because of their intact marriage, their stable and greater income, and their experience as parents, are perhaps more fit than the mother. However, as our supreme court has stated, "`[m]erely because some other person may be more fit should not be a basis for defeating the parent's natural right.'" Griggs v.Barnes, 262 Ala. 357, 364, 78 So.2d 910, 917 (1955) (quoting Inre Guardianship of Smith, 255 P.2d 761, 763 (Cal. 1953), opinion vacated, 42 Cal.2d 91, 265 P.2d 888 (1954)). This mother is employed, she rents a home, and she has friends upon whom she can rely for assistance. She sought treatment for depression on her own initiative, and she stated at trial that she would seek assistance again, through counseling or other methods, were she to become depressed or overwhelmed by her situation. The trial court commended the mother for the steps she had taken to improve her life. We do so as well. However, in our opinion, the improvements the mother has made serve to indicate her fitness not her unfitness. Accordingly, because the mother has a superior right to the custody of her children and because the evidence has failed to clearly and convincingly establish that she is unfit, we reverse the trial court's award of custody to the grandparents and remand this cause with instructions that the trial court enter a judgment awarding custody of the children to the mother.
REVERSED AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and PITTMAN and MURDOCK, JJ., concur.
THOMPSON, J., dissents.
[1] The record does not reveal the exact date on which the mother entered treatment, but, based on the testimony about the length of the treatment, it is possible that the mother entered treatment as early as August 2001. However, for ease of reading we will refer to September 2001 as the month in which the mother sought treatment.
[2] We do not cite Ex parte Terry, 494 So.2d 628, 632 (Ala. 1986), for this particular proposition, because although the clear-and-convincing standard applicable to an unfitness determination in cases involving a custody dispute between a parent and a nonparent appears to be well settled, the language most often cited from Ex parte Terry, which quotes Ex parteMathews, 428 So.2d 58, 59 (Ala. 1983), contains the phrase "`supported by competent evidence.'" (some emphasis omitted). Despite this difference in wording, the Terry court did state that "[t]he standard to be applied . . . is that applied . . . inEx parte Berryhill[, 410 So.2d 416 (Ala. 1982).]" Ex parteTerry, 494 So.2d at 632. The Berryhill court applied the clear-and-convincing standard and relied on two other cases that also clearly utilized that standard in cases involving a determination of unfitness in a custody dispute between a parent and a nonparent. See Griggs v. Barnes, 262 Ala. 357, 364,78 So.2d 910, 917 (1955), and Ex parte Sullivan, 407 So.2d 559,563 (Ala. 1981).