On Application for Rehearing

THOMPSON, Presiding Judge.
The opinion of March 28, 2008, is withdrawn, and the following is substituted therefor.
On April 28, 2006, N.K.M. (“the great-aunt”) filed a complaint seeking to have H.N.W. (“the child”) declared dependent and seeking an award of custody of the child. In her complaint, the great-aunt alleged that J.W., the child’s mother (“the mother”), had left the child, who was then seven years old, in the care of relatives since the child was an infant and that the child had been residing in the great-aunt’s home for the past year.[1] The great-aunt later amended her dependency complaint *528 to allege that the mother had abandoned the child and was unfit to have custody of the child. The mother did not file an answer, but she contested the dependency action. The juvenile court entered a pen-dente lite order based on an agreement reached by the great-aunt and the mother in which it awarded the great-aunt pen-dente lite custody of the child, awarded the mother visitation with the child on alternating weekends, and ordered that the child attend counseling.
The juvenile court conducted an ore ten-us hearing on the great-aunt’s dependency complaint. On June 29, 2007, the juvenile court entered a judgment in which it found the child to be dependent and awarded custody of the child to the great-aunt. The juvenile court awarded the mother a standard schedule of visitation and ordered her to pay monthly child support. The mother filed a postjudgment motion, and that motion was denied by operation of law. See Rule 59.1, Ala. R. Civ. P. The mother timely appealed.
The child was born 2 months before the mother turned 21 years old. The mother did not list the name of the child’s father on the child’s birth certificate. The great-aunt testified that the mother had never identified the child’s father and that that was one reason why she and the child’s great-grandmother had not been able to pursue a child-support action against the child’s father during the time that the child had lived with them.
At the time of the child’s birth in September 1998, the mother was living with her mother, A.R. (“the grandmother”). When the child was approximately two months old, the mother returned to work; her regular work hours were from 6:00 p.m. to 2:00 a.m. The mother’s grandmother, D.B. (“the great-grandmother”), took care of the child in her home while the mother worked. At that time, the great-aunt and her two daughters were also living in the great-grandmother’s home. The great-aunt helped in caring for the child when the mother was at work.
The great-aunt testified that the mother soon began leaving the child with the great-grandmother and her overnight. That arrangement gradually progressed into the mother’s leaving the child with them for more extended periods. According to the great-aunt, the child predominantly lived in the great-grandmother’s home for the first two years of the child’s life, even after the mother married and moved into her own apartment near the great-grandmother’s home.
The mother testified that she left the child overnight at the home of the great-grandmother to avoid interrupting the child’s sleep. The mother testified that the child lived with her during the first two years of the child’s life and that the great-grandmother only provided child care during the times when she was at work. We note that the testimony of C.S., another of the mother’s maternal aunts, supports the great-aunt’s allegations that the child had lived in the home of the great-grandmother since she was several months old.
It is undisputed that when the child was two years old the mother moved to Kentucky and left the child with the great-grandmother. The mother lived in Kentucky for approximately eight months. According to the mother, she telephoned the great-grandmother several times each week to talk to her about the child. When the mother returned to Alabama, she lived in the grandmother’s home for approximately a year. During that year, the child continued to live with the great-grandmother. The mother explained her decision to leave the child with the great-grandmother at that time by stating that the child, who was then three years old, *529 was in school and that she did not want to disturb the child’s daily routine. The mother stated that she “sometimes” saw the child on a daily basis during that time and that she visited the child on weekends if the great-grandmother and great-aunt did not have other plans with the child.
The mother then moved to Virginia to reconcile with R.J., a man with whom she previously had been involved. The mother married R.J. and lived with him in Virginia for approximately a year and a half. The mother testified that she did not take the child to live with R.J. and her in Virginia because she was trying to “get her life settled” and attempting to save some money so that she could bring the child to live with her. During the year and a half that the mother lived in Virginia, she saw the child on three occasions, and she spoke with the child by telephone a few times each week.
The mother returned to Alabama in 2002 with R.J. and a son born during the mother’s marriage to R.J. According to the great-aunt, the mother, R.J., and the son lived with the grandmother for a few months and then lived in them own apartment for approximately one year. The child continued to live in the home of the great-grandmother during that time.
The mother then moved to Tennessee, and the child continued to reside in the home of the great-grandmother with the great-grandmother and the great-aunt. The mother testified that she moved to Tennessee because the grandmother had also moved there. The record does not indicate when that move occurred; however, the mother divorced R.J. in Tennessee in November 2004, so it appears that she had been in Tennessee for some time when her divorce judgment was entered.
Pursuant to the 2004 Tennessee divorce judgment, R.J. was ordered to pay child support for the son who was born during the mother and R.J.’s marriage. At the hearing in this matter, the mother stated that R.J. was the child’s father. According to the mother, the Tennessee divorce judgment does not mention the child or provide support for her because, the mother stated, she did not want the child to “be brought into the turmoil.”
The mother stated that R.J. now wanted his paternity established and that, although no court action had been initiated, plans were underway for a DNA paternity test to establish his paternity. At one point during the hearing, the mother testified that she wanted R.J.’s paternity established so that she could receive child support from him; she later stated that she had no intention of pursuing a child-support action against R.J. The mother testified that, in the event the great-aunt was awarded custody of the child, she would provide the information necessary for the great-aunt to pursue an action to establish R.J.’s paternity and to receive child support from him.
The mother has been employed as a certified nursing assistant in Tennessee for approximately three years. At the time of the hearing, the mother was living in Tennessee with J.G., a man she identified as her fiancé. The mother testified that the child and J.G. have a good relationship. The mother stated that she and J.G. did not intend to marry until she obtained custody of the child so that the child could participate in the wedding. The mother explained that she did not want to marry during her weekend visitation with the child because, she said, she wanted to spend that time focusing on the child.
The evidence indicated that the mother and her fiancé lived in a three-bedroom mobile home and that the child has her own bedroom in that home. The great-aunt testified that the mother’s home was *530 clean when she visited it. However, the great-aunt expressed concern that the mother’s fiancé owned the mobile home and the mother had no ownership rights in that home and that the mother would have no home if her relationship with J.G. ended.
The mother testified that in 2005 the great-aunt and other family members became concerned about the ability of the great-grandmother, who was in her 80s, to properly care for the child. At approximately the same time those concerns were raised, the great-aunt married and moved to a home with her new husband. The great-aunt testified that the child went to live with her when she married; she explained that the child resided with her during the week but that the child stayed after school with the great-grandmother and often visited the great-grandmother for at least one day on the weekend. The home of the great-aunt and her husband has separate bedrooms for each of the great-aunt’s two daughters, the husband’s daughter, and the child. Both the great-aunt and her husband, who is a math and special-education teacher, testified that they considered the child to be one of their own children and that the child seemed to be doing well in their family.
The mother testified that when concerns about the great-grandmother’s ability to continue to care for the child were raised, she had intended to bring the child to live with her. She testified, however, that she did not want to move the child until the child had finished the school year and that she had planned to move the child in the summer. It is undisputed, however, that the mother did not visit the child between December 2005 and April 2006, when the great-aunt filed the dependency complaint. The mother explained that, during that time, her work schedule was hectic and that she had maintained telephone contact with the child.
The mother stated that it was always her intention to someday return and to have the child live with her but that it had taken her longer than she expected to do so. The mother cited as factors that prevented her from properly parenting the child her age at the time the child was born (the mother was 20 years old at the time) and the fact that her father’s death the year before the child was born had caused her to suffer a period of depression.
Although it appears that she sometimes changed jobs, the mother has consistently maintained employment. However, she failed to pay any child support to the great-grandmother or the great-aunt. The mother initially testified that she allowed the great-grandmother to claim the child as a dependent on her income-tax return and that that arrangement constituted support; the mother later acknowledged that that agreement was designed to compensate the great-grandmother for providing child care while she worked.
The great-aunt indicated that she had filed the dependency complaint because the mother contacted the child’s school and requested that the child’s school records be transferred to Tennessee. We note that the great-aunt’s dependency complaint was filed in late April 2006, during the months in which the mother had failed to visit the child. The mother has not alleged that the great-aunt prevented her from visiting the child before the dependency complaint was filed, but, after that complaint was filed, a dispute concerning the mother’s visitation arose. The juvenile court entered a pendente lite order in which it, among other things, awarded the mother visitation with the child on alternating weekends, and, during the time this matter was pending, the mother regularly visited the child pursuant to that award. *531 Thus, the evidence at the hearing indicated that the mother’s visitation with the child after the filing of the dependency complaint was more frequent and consistent than it had been before that complaint was filed.
At trial, the mother seemed to question the great-aunt’s parenting abilities. The evidence elicited by the mother indicated that the great-aunt has a 20-year-old daughter who has applied for disability benefits due to extreme health concerns; that daughter has had a total of 5 surgeries due to back and gastrointestinal problems, and she suffers from asthma. The 20-year-old daughter had plans to attempt to attend college in the months following the hearing in this matter. The great-aunt’s 15-year-old stepdaughter spent a month in a mental-health facility in 2005 after an apparent suicide attempt made while she was living in the great-aunt’s home. The great-aunt explained that the 15-year-old child had taken a total of 5 pills on that occasion, and she attributed the incident to difficulties the child experienced after “comfing] back from living with her mother.”
The great-aunt alleged that she knew of no prior custody order pertaining to the child. The testimony at the hearing indicates that the mother had given the great-grandmother guardianship of the child at different times, apparently so that the child could be enrolled in school and could receive medical treatment when necessary. The mother testified that she could revoke those authorizations at any time. The record indicates that the mother was required to sign papers in 2005 to allow the child to be tested for learning disabilities. The child was ultimately diagnosed as having ADHD, and she attends some special-education classes.
Dr. Erin Smith, a clinical psychologist who conducted counseling sessions with the child, testified that she had also performed a parenting evaluation of the mother at the mother’s request. She stated that the mother had low-average intelligence but no serious deficits that would impair her ability to parent the child. Dr. Smith believed that the mother was capable of properly providing a home for the child and parenting her. Dr. Smith also testified that she had observed the mother and the child interact between appointments on two occasions, and she characterized those interactions as “positive.” According to Dr. Smith, the great-aunt and the child also have a positive relationship. Dr. Smith indicated that the great-aunt had informed her that she was seeking custody of the child to ensure a smooth and gradual transition of the child back to the mother’s custody; Dr. Smith testified that the results of her parenting analysis were based on that assumption.
Dr. Isabella Thomas-Heinsohn, a licensed professional counselor, conducted a parenting evaluation of the great-aunt. Dr. Heinsohn testified that the great-aunt was “more than fine” to parent the child and that the great-aunt seems to have the child’s best interests at heart.
The only factual finding contained in the juvenile court’s June 29, 2007, judgment was that the child “is and remains a dependent child” as that term is defined in § 12-15-1(10), Ala.Code 1975. Based on that finding, the juvenile court awarded custody of the child to the great-aunt. The mother has appealed.
The mother argues that the juvenile court erred in treating this matter as a dependency action. Section 12-15-1(10) defines a dependent child as one:
“a. Who, for any reason is destitute, homeless, or dependent on the public for support; or
*532 “b. Who is without a parent or guardian able to provide for the child’s support, training, or education; or “c. Whose custody is the subject of controversy; or
“d. Whose home, by reason of neglect, cruelty, or depravity on the part of the parent, parents, guardian, or other person in whose care the child may be, is an unfit and improper place for the child; or
“e. Whose parent, parents, guardian, or other custodian neglects or refuses, when able to do so or when such service is offered without charge, to provide or allow medical, surgical, or other care necessary for the child’s health or well-being; or
“f. Who is in a condition or surroundings or is under improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child; or “g. Who has no proper parental care or guardianship; or “h. Whose parent, parents, guardian, or custodian fails, refuses, or neglects to send the child to school in accordance with the terms of the compulsory school attendance laws of this state; or “i. Who has been abandoned by the child’s parents, guardian, or other custodian; or
“j. Who is physically, mentally, or emotionally abused by the child’s parents, guardian, or other custodian or who is without proper parental care and control necessary for the child’s well-being because of the faults or habits of the child’s parents, guardian, or other custodian or their neglect or refusal, when able to do so, to provide them; or
“k. Whose parents, guardian, or other custodian are unable to discharge their responsibilities to and for the child; or
“l. Who has been placed for care or adoption in violation of the law; or
“m. Who for any other cause is in need of the care and protection of the state; and
“n. In any of the foregoing, is in need of care or supervision.”
§ 12-15-1(10), Ala.Code 1975 (emphasis added).
Subsections a. through m. of § 12-15-1(10) are all alternative bases for a dependency finding. In addition to one or more of those alternatives, in order for a child to be determined to be dependent, subsection n. must also be met. Subsection n. of § 12-15-1(10) specifies that, in addition to the alternate bases for a dependency finding, a child is dependent if he or she “is in need of care of supervision.”
Section 12-15-52(c), Ala.Code 1975, requires a dependency complaint to allege:
“(1) The facts which bring the child within the jurisdiction of the court, the facts constituting the dependency, delinquency or need of supervision and that the child is in need of supervision, treatment, rehabilitation, care or the protection of the state, as the case may be.”
(Emphasis added.)
In this case, the great-aunt alleged in her dependency complaint facts indicating, among other things, that for the vast majority of the child’s life, the mother had left the child in the care of relatives while she lived elsewhere and that the mother had visited the child infrequently. The great-aunt later amended the dependency complaint to allege that the mother had abandoned the child and was unfit to have custody of the child. The great-aunt did not specifically allege in the dependency complaints that the child was “in need of care or supervision” as required by subsection n. of § 12-15-1(10). However, the *533 great-aunt made a number of factual allegations that, if true, would fall within the alternatives for dependency set forth in subsections a. through m. of § 12-15-1(10). Those factual allegations, together with the great-aunt’s allegation that the child was dependent and that the child’s best interests would be served by awarding custody to the great-aunt, are sufficient to invoke the jurisdiction of the juvenile court under the dependency statute. See § 12-15-52(c). In other words, we conclude that the allegation that the child was “in need of the care or supervision” pursuant to subsection n. of § 12-15-1(10) was implicit in the great-aunt’s dependency complaints. See W.T.H. v. 915 So.2d 64, 72 (Ala.Civ.App.2005) (dependency complaints that did not specifically allege that the child was in need of care or supervision were sufficient to trigger the jurisdiction of the juvenile court); Miller v. Alabama Dep’t of Pensions & Sec., 374 So.2d 1370, 1377 (Ala.Civ.App.1979) (same).
The mother contends that there is not clear and convincing evidence in this case to support a finding that the child is dependent, and she argues that, based on that purported lack of supporting evidence, the juvenile court erred in treating this matter as a dependency action. The mother contends that this case is actually merely a custody case between relatives and, therefore, that, in order to gain custody of the child, the great-aunt was required to meet the stringent burden set forth in Ex parte Terry, 494 So.2d 628 (Ala.1986) (holding that a nonparent seeking custody of a child must prove the child’s parent to be unfit).
The mother relies on C.P. v. M.K., 667 So.2d 1357 (Ala.Civ.App.1994) (“C.P. v. M.K. II”), in which this court addressed the second appeal arising from the dispute between the parties. In the first appeal, this court, without setting forth any details of the facts, issued a short opinion stating that although the trial court had treated the matter as a dependency action, the action was actually in the nature of a custody dispute between the child’s mother and third parties. C.P. v. M.K., 618 So.2d 126 (Ala.Civ.App.1992). After remand, the trial court found the mother to be unfit, found the child to be dependent, and awarded custody to the petitioners. C.P. v. M.K. II. This court, without a full recitation of the facts and again noting that the action was in the nature of a custody dispute, held that the evidence did not support a finding that the mother was unfit to have custody of the child. C.P. v. M.K. II, 667 So.2d at 1358-59. The facts as set forth by the dissent in C.P. v. M.K. II indicate that the 16-year-old mother had often left the child, who was 3 years old at the time of the evidentiary hearing, in the care of the petitioners while she pursued the father; that the mother often had failed to provide for the child’s basic needs; that the mother had failed to maintain contact with the child; and that the mother had failed to provide the child a stable home. C.P. v. M.K. II, 667 So.2d at 1361-62 (Thigpen, J., dissenting).
In her brief submitted to this court, the mother relies on the dissent in O.L.D. v. J.C., 769 So.2d 299 (Ala.Civ.App.1999). In his dissent in O.L.D. v. J.C., Presiding Judge Crawley argued that the action involved a custody dispute rather than a dependency action. In O.L.D. v. J.C., grandparents had adopted their daughter’s child after the mother had been murdered. The father had not seen the child in approximately six years. When he discovered that the mother had died, the father hired an attorney, learned of the adoption, and sought to have the adoption set aside. *534 The juvenile court set aside the adoption,[2] and the grandparents filed a dependency petition in which they sought custody of the child. The juvenile court awarded custody to the grandparents. On appeal, this court affirmed, concluding that a finding of dependency was implicit in the juvenile court’s judgment and that the evidence supported such a finding.
Our research has revealed other cases in which this court has held that a case was more in the nature of a custody dispute than a dependency action. In J.A.P. v. M.M., 872 So.2d 861 (Ala.Civ.App.2003), the mother filed a complaint for a divorce from her husband, who was the father of a son born of the marriage and the stepfather of her daughter from a previous marriage. The husband and the children’s maternal grandmother filed a dependency petition with regard to the mother’s daughter at approximately the same time the divorce complaint was filed. The mother and the husband agreed to transfer the custody dispute regarding the son to the juvenile court that was determining the dependency allegations pertaining to the daughter. The juvenile court ultimately found the children to be dependent and awarded custody of them to the maternal grandmother. The mother appealed with regard to the son. This court reversed, concluding that the evidence did not support a finding of dependency and that the action pertaining to the son was more in the nature of a custody dispute than a dependency matter.
In S.D.F. v. A.K., 875 So.2d 326 (Ala.Civ. App.2003), the father sought to modify a prior custody order by seeking an award of custody of the child. The mother and the father made a number of allegations against each other regarding the other party’s ability to properly parent the child. The trial court entered a judgment finding the child dependent and awarding custody to the father. This court reversed after concluding that the parties’ allegations and the evidence did not rise to the level necessary to treat the action as one involving a dependent child. Rather, this court held that the dispute between the father and the mother was in the nature of a custody dispute rather than a dependency action. S.D.F. v. A.K., supra.
In Ex parte A.R.S., 980 So.2d 401 (Ala. 2007), another case relied on by the mother, the child’s grandmother appealed a trial court’s judgment rejecting her argument that the child was dependent and awarding custody of the child to the child’s father. In that case, our supreme court stated:
“In light of the evidence concerning [the father’s] gainful employment and his abstinence from drugs and [the grandmother’s] advanced age, as well as conflicting evidence as to whether [the father] abandoned [the child] or voluntarily relinquished custody of her or whether [the grandmother] prevented him from seeing [the child], we cannot conclude that the trial court committed clear and palpable error in finding that [the child] is not dependent and in dismissing the consolidated petitions.”
Ex parte A.R.S., 980 So.2d at 404 (footnote omitted). The mother cites this case as an example of a situation in which a father who had not lived with or visited his child was awarded custody. However, in that case, the trial court entered a judgment in favor of the father, the parent who had not had much contact with the child. Our supreme court affirmed, concluding that *535 “[the grandmother] has failed to 'prove that the trial court’s order [awarding custody to the father] was clearly erroneous.” 980 So.2d at 404 (emphasis added).
The dissent contends that because the mother left the child with relatives who properly cared for the child during the five to seven years the child resided with them, the child cannot be determined to be dependent. Under the reasoning of that argument, it seems that the dissent would also argue that a child could never be deemed “abandoned” by his or her parent so long as the child was abandoned with relatives capable of caring for the child. See § 12 — 15—l(10)i., Ala.Code 1975 (citing abandonment by a parent as a basis for a dependency finding). The dissent argues that dependency may not “ ‘begin’ ” if a child is “in the custody of and being properly cared for by suitable relatives.” 999 So.2d at 541. However, in making that argument, the dissent equates the mother’s merely leaving the child in the physical custody of relatives with court orders awarding legal custody of a child to a relative. See 12-15-1(17), Ala.Code 1975 (defining “legal custody”). The dissent relies on S.P. v. E.T., 957 So.2d 1127 (Ala. Civ.App.2005), in arguing that “a child’s dependency ends ... after such a transfer of custody.” 999 So.2d at 541. First, in this case, there has been no transfer of legal custody to the great-aunt or to the other relative with whom the mother left the child. Also, the full text of the quote from S.P. v. E.T., supra, reveals that that case involved numerous dependency findings and dispositional orders:
“Unlike many other types of cases, dependency proceedings often involve a series of appealable dispositional custody orders. Eventually the trial court enters an order in a dependency proceeding that is intended to be its ‘final’ dispositional order as to the pending case, i.e., a custodial placement that is intended to be permanent, to the extent custody awards can be permanent. See Ex parte J.P., 641 So.2d [276,] 278 [ (Ala.1994) ] (‘by its very nature, custody is always temporary and never permanent’ because it is always subject to change based upon an appropriate petition and evidence). Under ideal circumstances, such final dispositional orders coincide with the end of the child’s dependency, i.e., the child has a proper custodian ‘and ’ is no longer ‘in need of care or supervision’ by persons other than the custodian. See Ala.Code 1975, § 12-15-l(10)n. In other words, under ideal circumstances, the final dispositional order results in a custody award wherein the parent or custodian is able and willing to have the care, custody, and control of the child, free from any intervention or supervision by the state under the dependency statutes.”
957 So.2d at 1131 (emphasis on “and” original; other emphasis added).
In this case, the record indicates that there is no prior custody order with regard to the child. In her complaints and in her testimony at the ore tenus hearing, the great-aunt alleged that the child had been left by the mother in the care of relatives for the majority of the child’s life, which the great-aunt alleged constituted an abandonment of the child; that the mother had visited the child only infrequently; and that the mother had failed to contribute financial support for the child. We conclude that the allegations in the great-aunt’s dependency complaint set forth sufficient grounds for finding a child dependent as that term is defined in § 12-15-1(10). Those allegations, and the evidence presented at the ore tenus hearing, support the juvenile court’s treatment of this action as a dependency action. We also conclude that the mother has failed to demonstrate that the juvenile court erred *536 in treating this matter as a dependency action.
The mother also argues that the evidence does not support the juvenile court’s finding of dependency.
“A finding of dependency must be supported by clear and convincing evidence. § 12-15-65(f)[, Ala.Code 1975]; M.M.S. v. D.W., 735 So.2d 1230, 1233 (Ala.Civ.App.1999). However, matters of dependency are within the sound discretion of the trial court, and a trial court’s ruling on a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong. R.G. v. Calhoun County Dep’t of Human Res., 716 So.2d 219 (Ala.Civ. App.1998); G.C. v. G.D., 712 So.2d 1091 (Ala.Civ.App.1997); and J.M. v. State Dep’t of Human Res., 686 So.2d 1253 (Ala.Civ.App.1996).”
J.S.M. v. P.J., 902 So.2d 89, 95 (Ala.Civ.App.2004). Also, “ ‘[i]t is ... well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.’ ” Ex parte Fawn, 810 So.2d 631, 633 (Ala.2001) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996)).
As facts supporting her contention that the child was not dependent, the mother cites Dr. Smith’s parenting assessment indicating that she is capable of parenting the child, the fact that she has maintained employment, and the fact that she is successfully parenting her son, who, like the child at issue, also has ADHD. In her brief submitted to this court, the mother states that she waited to seek custody of her child to avoid disrupting the child’s life and upsetting her family; she compares her actions to those of “the Mother in the biblical King Solomon story.”
The record, however, does not support the mother’s position. The mother has not had physical custody of her child, at the latest, since the child was two years old. She has repeatedly elected to move to other states and leave her child with family members. During at least one extended period, the mother failed to visit the child and only maintained telephone contact with her. Although she has purchased clothes for the child to wear when the child visits her, the mother has never made any contribution to the support of her child while the child has been in the care of relatives. Also, the juvenile court could have concluded that by waiting to identify the child’s father until the hearing of this matter, the mother also prevented the child from receiving support from the father.
 This court has not analyzed this case as a custody case between a parent and a nonparent. However, we note that in the context of custody cases this court has encouraged parents or family members to work together with regard to custody arrangements during “necessitous times.” See Ex parte Couch, 521 So.2d 987, 990 (Ala.1988) (“We decline to discourage amicable arrangements” concerning custody); M.D.K. v. V.M., 647 So.2d 764, 765 (Ala.Civ.App.1994) (“This court and our Supreme Court have encouraged custodial arrangements during necessitous times.”). Just as the courts have, depending on the facts, considered whether a parent voluntarily relinquished custody of a child by temporarily transferring custody during necessitous times, we believe that a court may consider whether an arrangement during necessitous times calls into play the dependency statutes. However, we find the following statement by then Judge Murdock in a special writing to be instructive with regard to the specific facts of this case:
*537 “[E]ven if the evidence in this case supported the conclusion that the change in actual physical custody of the child began as an amicable and temporary arrangement, that would not remove subsequent developments from consideration by the trial court. The fact that a change in actual physical custody might begin as an amicable and temporary arrangement for ‘necessitous times’ does not mean that it cannot evolve into something quite different. When a parent with the legal right to physical custody surrenders actual physical custody of his or her child to [another person] for such an extended period of time as occurred in this case, especially when, during that period, the surrendering parent maintains so little involvement with and support of the child as occurred in this case, the fact that the change in actual physical custody might have begun as an amicable and temporary arrangement does not serve to insulate the legal custodian from a finding that he or she thereafter ‘voluntarily relinquished’ the custody of the child. Such an outcome should not be viewed as ‘discouraging rational, reasoned decisions by ... parents regarding the welfare of their children’ or temporary, ‘amicable arrangements’ for necessitous times. See generally [Ex parte] Couch, 521 So.2d [987,] 990 [ (Ala.1998) ]; Curl [v. Curl], 526 So.2d [26,] 28 [ (Ala.Civ.App.1988) ]. Instead, it simply is a recognition of the reality that, even in the context of what begins as a temporary, amicable arrangement for necessitous times, it is possible for a parent to voluntarily relinquish custody of his or her child. Temporary arrangements for necessitous times are one thing; abandonment of a child to [another person] is another.”
Pickett v. Pickett, 792 So.2d 1124, 1132 (Ala.Civ.App.2001) (Murdock, J., concurring specially).
The evidence supports a finding that the mother has had the ability to properly parent and provide for the child for some time but that she elected not to do so. During the hearing, the mother repeatedly attempted to, and finally successfully did, state that various family members had “advised” her to leave the child in the care of the great-grandmother and the great-aunt. In her brief on appeal, the mother makes the unsupported allegations that she repeatedly attempted to regain physical custody of the child but that “family members thwarted her attempts.” At the hearing, the mother acknowledged that the family members could not have overcome her rights and prevented her from providing a home for her child.
We also note that the discrepancy between the mother’s actions and her testimony at trial might have impacted the juvenile court’s assessment of the mother’s credibility. The mother testified that she had intended to have the child resume living with her at some point in 2005, when the child went to live with the great-aunt, but that she did not want to disrupt the child’s school year. However, the mother admitted that she had failed to visit the child from December 2005 through April 2006, the time during which, she stated, she was planning to have the child return to live with her. The mother had also cited her reluctance to disrupt the child’s routine with regard to at least one of the occasions in which she had elected to leave the child in the care of the great-grandmother. Additionally, the mother insisted that she intended to marry the man with whom she was living and that the wedding had been postponed until after the dependency action was resolved so that the child could participate in the wedding. The *538 mother testified that she did not want to marry during one of her weekend visitations with the child because she wanted to focus on the child during those visitations.
Given the discrepancy in the evidence on some points, as well as the discrepancy between the mother’s testimony regarding her intentions to regain custody of the child and her continued failure to do so, the juvenile court could have interpreted some of the mother’s explanations of her failure to parent the child and her allegations against other family members as lacking in credibility.
“The trial court received ore tenus evidence and was in the best position to observe the child and the other witnesses while they testified and to evaluate their demeanor and credibility. Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). Therefore, its determinations based on that evidence are entitled to a presumption of correctness on appeal and will not be reversed absent a showing that they are clearly erroneous. Ex parte Anonymous, 803 So.2d 542, 546 (Ala.2001).”
J.S.M. v. P.J., 902 So.2d at 96.
We note that, as part of her argument on appeal, the mother argues that her present circumstances do not warrant a determination that the child is dependent. She cites cases in which, she maintains, the court has more recently emphasized a parent’s recent conduct and current circumstances in determining whether to terminate parental rights or whether to modify custody of a child. See W.P. v. Madison County Dep’t of Human Res., 980 So.2d 1016, 1023 (Ala.Civ.App.2007) (the court, although concluding that the father’s recent conduct had improved and that the termination of his parental rights was not supported by the evidence, noted that “ ‘ “[p]ast history, as well as present circumstances, may properly be considered by the court in a termination proceeding” ’ ” (emphasis added)); see also Russell v. Russell, [Ms. 2050655, Feb. 1, 2008] — So.3d -, - (Ala.Civ.App.2008) (“Although the evidence demonstrated that an overwhelming necessity for a change in custody had existed at one time, i.e., when the mother was addicted to drugs and undergoing treatment for that addiction, it did not demonstrate that an overwhelming need for a change existed as of the date the trial ended because, by then, the mother had abstained from abusing drugs for approximately two and one-half years.”).
In those cases, however, the evidence indicated that the parents had altered the circumstances of their lives to enable them to be more stable or appropriate parents. The evidence in this case supports a finding that the mother’s current circumstances are similar to her circumstances during the periods in which she elected to leave the child with relatives rather than provide a home for the child herself. The mother has always maintained employment (albeit at different jobs); she indicated that her present employment pays well and allows her a favorable schedule, yet she did not attempt to provide support for the child. The mother is living in her fiancé’s home in Tennessee; in the three years she has lived in Tennessee, the mother has made no effort to have the child live with her.
The mother explained that she had had “turmoil” in her life and that she had wanted to save some money before the child came to live with her. We are not without sympathy for the mother, and we commend her efforts to take control of her life. However, the mother has attempted to do so for the vast majority of the child’s seven years while leaving the child in the care of, and to be supported by, relatives. The mother left the child with relatives for over a year and a half while she was in *539 another state and married to the man she now identifies as the child’s father. Even when she returned to live in Alabama with that man, the mother left the child with the great-grandmother. The mother has been in Tennessee for three years, living with another man and maintaining full-time employment at what she characterized as a job that pays well. When concerns about the great-grandmother’s ability to care for the child were raised, the mother left the child with the great-aunt and failed to visit the child for many months.
As already stated, the juvenile court could well have questioned the credibility of the excuses the mother offered to explain her repeated and continued absences from the child’s life. Further, the juvenile court also could have disbelieved the mother’s contentions that she wanted, at the time of the hearing, to provide a home for the child.
The evidence indicates that the mother repeatedly left her child in the care of others for a period of at least five years, and the evidence supports a finding that during much of that time the mother was able, but elected not, to care for the child herself. The evidence also supports a conclusion that the mother, who was able to do so, provided the child no support and visited relatively infrequently. Given the factual history of this case and the discrepancies in some parts of the mother’s testimony, the juvenile court could have questioned whether the mother intended to or would provide a home for the child for any significant length of time. Thus, we conclude that the evidence in the record was sufficient for the juvenile court to conclude that the child was “in need of [the] care or supervision” of the great-aunt, who, together with the great-grandmother, had provided for and cared for the child for the vast majority of the child’s life. See § 12-15-l(10)n., Ala.Code 1975.
Accordingly, given the evidence in the record, the juvenile court’s ability to assess the credibility of the witnesses as they testified, and the resulting presumption in favor of the juvenile court’s judgment, we agree with the juvenile court that the evidence was sufficient to support a finding that the child was dependent. We conclude that the mother has failed to demonstrate that the juvenile court’s dependency finding was plainly and palpably wrong or clearly erroneous. Ex parte Farm, supra; J.S.M. v. P.J., supra.
The mother has not argued that, assuming that it did not err in finding the child to be dependent, the juvenile court erred in awarding custody of the child to the great-aunt. Accordingly, we must deem that issue to have been waived. Robino v. Kilgore, 838 So.2d 366, 370 (Ala. 2002); Pardue v. Potter, 632 So.2d 470, 473 (Ala.1994).
The last argument that the mother asserts in her brief on appeal is that the juvenile court erred in failing to conduct a hearing on her postjudgment motion. Rule 59(g), Ala. R. Civ. P., requires that a trial court conduct a hearing on a postjudgment motion if such a hearing is requested in that motion. However, the failure to conduct a hearing on a post-judgment motion “is reversible error only if it ‘probably injuriously affected substantial rights of the parties.’ ” Kitchens v. Maye, 623 So.2d 1082, 1088 (Ala.1993) (quoting Greene v. Thompson, 554 So.2d 376, 380-81 (Ala.1989)). If the failure to conduct a hearing did not “injuriously affect[] [the] substantial rights of the parties,” that failure, while error, was harmless. Id.
“ ‘Harmless error occurs, within the context of a Rule 59(g) motion, where there *540 is either no probable merit in the grounds asserted in the motion, or where the appellate court resolves the issues presented therein, as a matter of law, adversely to the movant, by application of the same objective standard of review as that applied in the trial court.’ ”
Kitchens v. Maye, 623 So.2d at 1088-89 (quoting Greene v. Thompson, 554 So.2d at 381).
In this case, we have already resolved the issues raised in the postjudgment motion against the mother. Thus, we must conclude that there was no “probable merit” to the arguments raised in that motion. Kitchens v. Maye, 623 So.2d at 1088-89. Accordingly, we cannot say that the mother has demonstrated reversible error with regard to the juvenile court’s failure to conduct a hearing on her postjudgment motion.
The great-aunt’s request for an attorney fee is denied.
OPINION OF MARCH 28, 2008, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING OVERRULED; AFFIRMED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., dissents, with writing.

. The great-aunt is the daughter of the child’s great-grandmother and is the sister of A.R., the mother's mother. Therefore, she is the mother's maternal aunt and the child's great-aunt.

. It does not appear that the juvenile court’s jurisdiction to set aside the adoption was at issue.