49 So.3d 1220 (2010)
Kristie Dawn STOCKS
v.
Michael Anthony STOCKS, Sr., Deborah S. Oswalt, Michael L. Oswalt, and Betty Stocks.
2080941.
Court of Civil Appeals of Alabama.
April 30, 2010.
*1222 Audrey Oswalt Strawbridge of Strawbridge, Strawbridge & Strawbridge, L.L.C., Vernon, for appellant.
J. Dale Lawrence of Holder, Moore, Lawrence & Langley, P.C., Fayette, for appellees Deborah S. Oswalt, Michael L. Oswalt, and Betty Stocks.
PER CURIAM.
Kristie Dawn Stocks ("the mother") and Michael Anthony Stocks, Sr. ("the father"), were married in November 1997, after the birth of their first child, Hunter, in August 1997. Hunter is autistic. In October 2000, the parents had their second child, Trey. Sadly, Trey suffered an aneurysm in his spinal column in May 2001; he survived, but he is confined to a wheelchair and has the use of only his right hand. Thus, both Hunter and Trey ("the children") have special needs.
In September 2002, the parents separated, and the children remained with the mother. The mother sued for a divorce from the father in August 2004; however, although the mother secured a default judgment against the father when he failed to answer the complaint or otherwise defend the action, that judgment was set aside on the father's motion and the action remained pending on the trial court's docket.
In March 2008, the father filed an answer to the divorce complaint and a counterclaim seeking temporary and permanent physical custody of the children. The trial court entered a temporary ex parte order placing the children in the custody of the father; however, because the father had alleged in his counterclaim that Hunter was residing with Betty Stocks ("the paternal grandmother") and that Trey was residing with Debbie S. Oswalt ("the paternal aunt") and Michael L. Oswalt ("the paternal uncle"), the trial court ordered that Hunter remain in the home of the paternal grandmother and that Trey remain in the home of the paternal aunt and the paternal uncle (the paternal grandmother, the paternal aunt, and the paternal uncle are hereinafter referred to collectively as "the custodians").
*1223 The mother moved to dissolve the temporary ex parte custody order and amended her divorce complaint. The custodians then moved jointly to intervene in the action and filed a petition seeking custody of the children. The custodians alleged that the children had been in the home of each child's respective custodian since September 2007 and that the mother and the father had, through their actions, voluntarily relinquished the custody of the children to their respective custodians. The father amended his answer and counterclaim in response to the mother's amended divorce complaint.
On March 14, 2008, after a hearing, the trial court entered a pendente lite order addressing the temporary custody of the children pending the outcome of the litigation of the custody dispute. That order awarded the parents temporary joint legal custody of the children and awarded the paternal grandmother temporary physical custody of Hunter and the paternal aunt and the paternal uncle temporary physical custody of Trey. The order outlined the visitation awarded to the mother and the father; the order also awarded the mother telephone visitation with Trey. Pursuant to the order, the custodians and the mother were required to cooperate in the care of the children and to cooperate so that the children could visit each other. The order further required the mother to submit to random drug screens through the court referral office.
The trial court entered a judgment divorcing the parties on March 25, 2008. However, the trial court retained jurisdiction over the remaining issues between the parties, which primarily involved the custody of the children. On June 18, 2008, the mother filed a petition alleging that the custodians were in contempt of court for violating the pendente lite order. Ultimately, the trial court held a trial on the contempt and the custody issues on July 23, 2008.
In the judgment resolving the custody issues, the trial court declined to find any party in contempt. The trial court further determined that the mother and the father had not voluntarily relinquished custody of the children to the custodians because the arrangement for the care of the children was intended by all parties to have been temporary. The judgment further determined that the mother and the father were unfit to have the custody of the children and awarded custody of each child to his respective custodian or custodians. The mother and the father were awarded visitation, and the father was ordered to pay child support. The mother was not employed at the time of the trial, and the trial court reserved jurisdiction to award child support from the mother once she became employed. The mother appealed that judgment; we dismissed the appeal as having been taken from a nonfinal judgment. Stocks v. Stocks, 25 So.3d 480 (Ala. Civ.App.2009). After the dismissal of the first appeal, the trial court entered a judgment addressing the remaining issues of alimony and property division, rendering its judgment final. The mother appealed for the second time. The father did not appeal.
We note at the outset that "[w]hen a trial court `makes findings of fact based on evidence presented ore tenus, an appellate court will presume that the trial court's judgment based on those findings is correct....'" CP. v. W.M., 837 So.2d 860, 864 (Ala.Civ.App.2002) (quoting Ex parte Byars, 794 So.2d 345, 347 (Ala. 2001)). The basis for the ore tenus presumption is well settled:
"`"This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This *1224 opportunity to observe witnesses is especially important in child-custody cases. `In child custody cases especially, the perception of an attentive trial judge is of great importance.' Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981)."

"`Ex parte Fann, 810 So.2d 631, 633 (Ala.2001). This court is not allowed to reweigh the evidence or to substitute its judgment for that of the trial court. Ex parte Bryowsky, 676 So.2d 1322 (Ala. 1996).'"
G.H. v. K.G., 909 So.2d 206, 208-09 (Ala. Civ.App.2005) (quoting Estrada v. Redford, 855 So.2d 551, 555 (Ala.Civ.App.2003)). In a case like the present case, in which the burden of proof is to establish facts by clear and convincing evidence, see Ex parte Terry, 494 So.2d 628 (Ala.1986), discussed infra, this court must determine on appeal whether there exists evidence in the record from which the trial court could have concluded that the fact sought to be proved was clearly and convincingly established. See Ex parte Mclnish, 47 So.3d 767, 772 (Ala.2008) (quoting with approval KGS Steel, Inc. v. Mclnish, 47 So.3d 749, 756 (Ala.Civ.App.2006) (Murdock, J., concurring in the result)).
After the entry of the default divorce judgment in 2004, the mother began a relationship with Edward "Chet" Cannon. The mother's relationship with Cannon resulted in the birth of her third child, Aislyn, in January 2006. Aislyn was born slightly premature via a caesarean section and had a severe case of acid reflux as an infant; she underwent surgery to assist with that problem. The mother developed complications after Aislyn's birth and later suffered a miscarriage in July 2006. An ultrasound of her abdomen at that time showed some cysts that would require surgical removal; however, the mother had no hospitalization or medical insurance at the time and chose not to seek further treatment. Over the next year, the mother continued to suffer from health problems. She continued to have abdominal pain and also experienced painful menstrual cycles.
The following summer, in August 2007, the mother sought treatment of a spider bite to her foot at the emergency room. During her follow-up visit with Dr. Jon Sanford, the mother discussed some of her health problems with him, including her painful menstrual cycles and continuing abdominal pain. Dr. Sanford discussed with the mother the possibility of undergoing a radical hysterectomy. When the mother expressed favorable interest in the procedure, Dr. Sanford referred the mother to Dr. Dan Avery, who performed the procedure on September 20, 2007.
Before the mother underwent her surgery, she sought the assistance of the paternal aunt, mentioning to the paternal aunt the need for someone to take care of the children during the surgery and the recovery period afterward. The paternal aunt indicated that the children would be cared for, and she arranged for Trey to stay with her and for Hunter to stay with the paternal grandmother. The mother underwent her surgery, and, during her recovery period, she was prescribed Ultracet and Lortab, two opiate-derived pain medications. Over the next several months, the mother suffered from further health issues and complications.
The mother continued to suffer abdominal pain, which was sometimes extreme, immediately after the hysterectomy. After further medical examinations discovered that the mother had a kidney stone, she underwent a procedure to remove the kidney stone on October 25, 2007. After the kidney stone was removed, the mother had another surgery to remove internal hemorrhoids and to remove her appendix in early November 2007. The mother was prescribed *1225 Lortab as a pain medication following her November surgery. After that surgery, the mother developed a staph infection, which resulted in several sores on her buttocks and her rectal and genital area. She also developed sores on her arm and one on her face, which likely resulted from her hand, wrist, or arm coming in contact with a sore while cleansing it and her having touched her face without adequately sanitizing the skin. The mother underwent two rounds of antibiotic treatment as a result of the staph infection in December 2007 and January 2008.
Although it was unrelated to her two surgeries, the mother also developed an abscessed tooth in March and April 2008. The mother sought treatment in the emergency room twice for the pain resulting from the abscess. She received prescriptions for antibiotics and for Lortab on both visits. The mother never sought treatment from a dentist for her tooth abscess.
In late February 2008, the mother, Cannon, and Aislyn moved into a new residence. The mother discussed with the custodians the children's returning home because her health had improved; however, the mother said that she was discouraged from having the children returned home with excuses that they were participating in a wedding and that the home would not be ready for the children, especially Trey, until all the packing boxes had been removed. The mother agreed to wait a few weeks to be fully unpacked and to allow the children to participate in the wedding as planned. However, in March, the father filed his motion for custody and the custodians moved to intervene in the divorce action, and the children were never returned to the mother's custody.
At the trial, which was held in July 2008, the custodians presented evidence regarding the mother's alleged drug abuse. The custodians also presented testimony indicating that the mother had failed to visit the children or to provide for their support between September 2007 and March 2008. The paternal aunt also testified that the mother had falsely reported that she had been diagnosed with cancer.
According to the custodians, the mother had given them a combined total of $240 since September 2007 to financially assist in the care of the children. The mother admitted that she had not provided much in the way of monetary support to the custodians. However, the mother testified that she had paid for the children's medications and diapers. According to the mother, she had offered financial assistance only to be told by the paternal grandmother that the custodians would ask for financial assistance when the money that the father had provided was exhausted or when they needed it. The mother also stated that she felt that it was time for the father to shoulder some of the financial responsibility for the children. The mother admitted that the children each received $534 per month in Social Security benefits. She explained that she cashed the benefit checks and that she kept the money in a safe at her house. She said that she had used some of the money at times when she needed it to pay bills. The mother also explained that she had used some of the children's money to purchase items to furnish their rooms in the new house.
The custodians presented evidence indicating that the mother had tested positive for opiates on four drug screens and that she had also tested positive for methamphetamine on one drug screen. The paternal aunt also testified that the mother had had prescriptions that Trey no longer needed refilled at the pharmacy in November 2008. According to the paternal aunt, the mother's actions in having the pharmacy refill a prescription for a sedative for *1226 Trey despite the fact that the doctor had discontinued the use of that particular drug caused the paternal aunt concern that the mother might be abusing drugs. In addition, the paternal aunt said that the mother's weight loss in the summer of 2007 and her alleged staph-infection sores had raised in the paternal aunt's mind the suspicion that the mother was abusing drugs.
Regarding the mother's visitation with the children, the paternal aunt testified that the mother had visited with Trey a total of eight times between September 2007 and March 2008. The paternal grandmother testified that the mother had come to her home to visit Hunter only two times during that same six-month period; however, the paternal grandmother said that the mother had visited with Hunter briefly twice at the health-club facility owned by the paternal aunt and at which the paternal grandmother works. Both the paternal aunt and the paternal grandmother indicated that the mother's visits were often very short; based on the paternal aunt's testimony, nearly all the mother's visits were no more than 20 minutes in length, if that long, and some were a mere 5 minutes. The paternal aunt also testified that she had taken Trey to visit the mother five or six times at the mother's former residence and that the mother had visited in the driveway instead of inviting the paternal aunt and Trey inside on all but one visit.
The paternal aunt said that, once the mother was awarded telephone visits with Trey in the March 2008 temporary custody order, the mother telephoned Trey 10 times in March but only once in April. According to the paternal aunt, Trey does telephone his mother. Before the entry of the temporary order in March 2008, the mother had telephoned the paternal aunt approximately 12 times; the paternal aunt said that most of the time the mother discussed her health problems and only briefly inquired as to the children. The paternal grandmother said that the mother had not telephoned her even once to check on Hunter. The mother admittedly did not telephone Hunter; however, Hunter is a nonverbal autistic child and any attempts to communicate with him over the telephone serve to agitate and frustrate him.
The paternal aunt also testified about the circumstances surrounding the mother's decision to seek assistance caring for the children in September 2007. According to the paternal aunt, the mother telephoned her, nearly hysterical, and stated that test results had indicated that the mother had cancer. The paternal aunt said that she went to the mother's home and discussed with the mother her need for assistance in caring for the children while the mother underwent surgery. According to the paternal aunt, the paternal aunt reassured the mother that the children would be cared for and stated that the mother should focus on getting better. The paternal aunt said that, over the next few months, the mother continued to report that she had late-stage cancer and that it had been discovered in places like the mother's liver and one of her kidneys. When the mother had not seen an oncologist or begun any type of cancer treatment, said the paternal aunt, the family became suspicious about the mother's claims. The mother herself did not deny that she had told the paternal aunt that she had been diagnosed with cancer; she also never testified that she had made statements to that effect. Dr. Sanford testified that the mother had not been diagnosed with cancer.
As outlined above, the mother presented evidence indicating that she had, in fact, suffered from several health problems in the fall of 2007 and into early 2008. The *1227 mother admitted having tested positive for opiates on March 7, 2008, March 28, 2008, April 10, 2008, and May 8, 2008. For each of those positive screens, the mother said, she had provided the court referral office a valid prescription for Lortab. The only positive drug-screen result the mother could not adequately explain was the April 10, 2008, screen that indicated that she had ingested methamphetamine. The mother said that she had taken some samples of an antihistamine or sinus medication provided by Dr. Sanford around that time; she indicated that that medication might have caused the screen to show a false positive for methamphetamine. However, the custodians presented the testimony of Danny Jenkins, a member of the 24th Judicial Circuit Drug Task Force; he testified that he knew of no other drug that might lead to a positive result for methamphetamine on a drug screen.
The mother tested negative for all substances on the seven drug screens she took between the May 8, 2008, positive screen and the July 2008 trial. She presented the testimony of Dr. Sanford, who opined that the mother's prescriptions for pain medication during September, October, November, and December 2007 were warranted based upon the severity of her pain and the medical procedures she had undergone. Dr. Sanford testified that he had seen no indications that the mother was abusing illegal drugs and that he had not witnessed any drug-seeking behavior from her. Dr. Sanford indicated that, at times, an antidepressant drug might cause a positive result for amphetamine on a drug screen.
Regarding her lack of visits with the children, the mother explained that she was very ill and recovering from surgery during October and November 2007 and that she had avoided contact with the children because of her staph infection in November and December 2007. According to the mother, she had been advised to avoid the children because of the possibility that the children might contract a staph infection from her. Dr. Sanford, when questioned about whether the mother could have been around the children while infected with staph, indicated that the mother was not precluded from being around the children but that she would have needed to take extra precautions, like wearing gloves and focusing on cleanliness, to avoid contamination. According to the paternal aunt, the mother did visit with Trey on one occasion in December while wearing a mask and gloves.
The mother indicated that she had requested additional visitation with the children after the entry of the March 14, 2008, pendente lite custody order. She said that she was never allowed to keep the children longer or to pick them up earlier than permitted by the order. She also testified that, in addition to failing to allow expanded or additional visitation, the paternal aunt and the paternal grandmother had failed to keep her informed of the children's doctor's appointments and changes in their medications and had failed to keep her informed about the children's school progress, including failing to have her included in the children's individualized educational plan ("IEP") meetings. Testimony from Mary Gravalee, the special-education coordinator for Fayette County, indicated that the mother was not included in the most recent IEP meetings because the school system understood that the mother did not have custody of the children at the time. When specifically questioned about whether she had realized that the mother had joint legal custody of the children, Gravalee answered in the negative.
Gravalee's testimony further indicated that the mother had been very involved in *1228 the children's earlier IEP meetings and had kept close contact with the children's teachers to monitor the children's progress in school. Other witnesses, including Rita Richardson, the county coordinator for Community Service Programs of West Alabama, and Jennifer Sanford, Trey's kindergarten teacher, testified that the mother was involved with her children. Ms. Sanford recalled that the mother would come eat lunch with Trey very often and that the mother was available for parent-teacher meetings, had frequent telephone contact with Ms. Sanford, and had exchanged notes back and forth regularly regarding Trey's progress. Richardson explained that she had visited the mother's former home on two occasions, and she noted that it was appropriate for both children, clean, and wheel-chair accessible. Richardson noted that the mother seemed very knowledgeable about Hunter's needs as an autistic child and that the mother appeared very proactive and wanted to raise concerns about Hunter's educational plan. Richardson said that the mother appeared to be a very good mother that was always seeking out ways to improve the children's environment and their lifestyle.
Regarding the allegations of drug abuse, the strongest evidence supporting the determination that the mother had "problems" with drugs were the positive drug-screen results outlined above. Other testimony at trial indicated that the mother did not exhibit signs of drug abuse. Jackie Estevan, a Department of Human Resources child abuse and neglect assessor, responded to a report of suspected drug abuse by the mother by making an unannounced visit to the mother's home on April 29, 2008. Estevan testified that she did not see anything that made her think that the mother had drugs in the home. She also said that neither Cannon nor the mother appeared to be under the influence of any drug at the time of the visit. However, at Estevan's request, the mother and Cannon underwent drug screens; the mother tested positive for amphetamines and opiates. Because of those results, Estevan instituted a safety plan for Aislyn that relied on Cannon's mother for the care of Aislyn when Cannon was unavailable because of his work schedule. The mother requested that the drug-screen results be further broken down because she had a valid prescription for hydrocodone; according to Estevan, "that checked out," and the safety plan was concluded, partly because the mother had passed other drug screens and partly because Cannon was no longer working the night shift and was available to provide care for Aislyn.
Jenkins testified that he visited the mother's residence, accompanied by Estevan, in late Spring 2008 after a tip regarding the mother's being involved in the manufacture of methamphetamine. Jenkins said that he looked around the house, accompanied by Cannon, and that he found no evidence that methamphetamine had ever been manufactured in the house. He noted that methamphetamine labs leave a strong chemical odor, which he did not detect in the mother's home.
The mother argues on appeal that the trial court erred in awarding custody to the paternal grandmother and to the paternal aunt and the paternal uncle because, she argues, the evidence does not support the trial court's conclusion that she is unfit. The trial court's judgment does find the mother unfit and specifically references that the mother had "problems" with both prescription drugs and methamphetamine. In addition, the trial court noted that the mother had exhibited poor judgment when she told the paternal aunt that she was suffering from late-stage cancer when she, in fact, was not. Finally, *1229 the judgment referenced the mother's failure to provide financial support for either child despite the fact that the mother received the children's Social Security benefits.
In a case such as this one, where the trial court is considering whether to award custody of children to nonparents, it is required to determine whether clear and convincing evidence establishes the unfitness of the parents. Ex parte Terry, 494 So.2d 628 (Ala.1986).
"`In a custody dispute between a parent and a nonparent, the parent has a prima facie right to custody of his or her child. Ex parte D.J., 645 So.2d 303 (Ala.1994). Unless the trial court finds that the parent is unfit, or that the parent has voluntarily relinquished custody of the child, or that the parent has lost custody of the child by virtue of a prior order, the law presumes that the best interests of the child will be served by giving the parent custody. Ex parte Terry, 494 So.2d 628 (Ala.1986); Ex parte Mathews, 428 So.2d 58 (Ala.1983); E.C.B. v. J.S., 612 So.2d 1243 (Ala.Civ. App.1992); Roden v. Colburn, 522 So.2d 290 (Ala.Civ.App.1988).'

"D.P.M. v. D.B., 669 So.2d 191, 193 (Ala. Civ.App.1995)....
"... That finding of unfitness must be supported by clear and convincing evidence. Ex parte Berryhill, 410 So.2d 416, 417 (Ala.1982); Ex parte Sullivan, 407 So.2d 559, 563 (Ala.1981); see also Griggs v. Barnes, 262 Ala. 357, 364, 78 So.2d 910, 917 (1955) (`"`The unfitness which deprives the parent of the right to the custody of a child must be positive, and not merely comparative or speculative, and must be shown by clear and satisfactory proof.'"' (quoting Esco v. Davidson, 238 Ala. 653, 655, 193 So. 308, 309 (1940) (quoting in turn, 46 Corpus Juris, p. 1243)))."
Horn v. Horn, 879 So.2d 1197, 1201-02 (Ala.Civ.App.2003) (first emphasis added; footnote omitted).
The evidence indicated that on several occasions the mother tested positive for opiates. The evidence also indicated that the mother obtained two prescriptions for Lortab for toothaches in March 2008, with the second and final prescription being filled on March 30. The mother changed her testimony three times regarding when she took the last of the prescribed painkillers; she testified that she thought she took the last of those painkillers either in the first, second, or the last week of April. The mother tested positive for opiates on May 8, 2008, as much as four weeks after she took the last of the painkillers prescribed on March 30 for her toothache. The mother testified that the prescription was for no more than 10 Lortab; thus, the trial court could have rejected the mother's testimony that her positive drug screen was the result of her proper use of a prescribed painkiller.
Likewise, the mother's excuse for testing positive for methamphetamine could also have been rejected by the trial court. The mother indicated that she believed that a sample antihistamine or sinus medication she had received from Dr. Sanford might have caused a false positive on the screen. The custodians, however, presented testimony from Jenkins, a member of the local drug task force, that he knew of no other drug that would show up as a false positive for methamphetamine on a drug screen.
The mother argues that, even assuming that she had developed a "problem" with drugs, the mere fact that she tested positive for drugs is not alone sufficient to uphold the trial court's determination that she is unfit to have custody of the children. *1230 She relies on Wester v. Wester, 500 So.2d 1106, 1107 (Ala.Civ.App.1986), in which this court held that a father's use of marijuana, although illegal, was not alone sufficient to support a modification of custody. The Wester court indicated that the evidence did not demonstrate that the father's admitted periodic drug use detrimentally affected the child. Wester, 500 So.2d at 1107. The mother points out that she did not have custody of the children when she tested positive for drugs and that the evidence did not demonstrate that any possible drug abuse on her part detrimentally affected the children. Although use of an illicit substance alone might not compel the conclusion that a parent is unfit, the trial court based its decision in the present case on several factors, only one of which was the mother's "problem" with drugs.
The trial court also relied on the fact that the mother had exhibited poor judgment when she told the paternal aunt that she had been diagnosed with cancer when she had not, in fact, been so diagnosed. The mother argues, relying on A.L. v. S.J., 827 So.2d 828, 834 (Ala.Civ.App.2002), that poor judgment on the part of a parent is not alone sufficient to deprive a parent of custody. Although the mother is correct that A.L. stands for that proposition, the trial court did not rely solely on the mother's lapse in judgment to conclude that she is unfit.
We must determine, then, whether the combined facts in this case, viewed with the attendant presumptions in favor of the trial court's findings, amount to clear and convincing evidence supporting the trial court's conclusion that the mother is unfit to have custody of her children. See G.H. v. K.G., 909 So.2d 206, 209 (Ala.Civ.App. 2005) (affirming a finding of unfitness based on the totality of the evidence presented, when the evidence was conflicting, because of the presumption in favor of the trial court's findings). The evidence, viewed one way, supports the trial court's conclusion that the mother had "problems" with prescription drugs and methamphetamine, based on the positive results on several drug screens. The evidence also supports a conclusion that the mother told the paternal aunt that she was diagnosed with cancer despite the fact that she had not been so diagnosed. The trial court also had ample evidence before it indicating that the mother did not consistently visit with or check on the children, even after her health problems had largely been resolved. Likewise, the evidence supports a conclusion that the mother cashed, retained, and, at times, used the children's Social Security disability checks instead of providing that money to the custodians for use in the care of the children.
However, as the trial court found, the mother made appropriate temporary arrangements for the care of her children in the face of her significant and debilitating health problems. A large portion of the evidence painted the picture of a mother who had been very involved in the schooling and the care of both of her special-needs children. The mother testified of her love for her children and called them her "heart." When questioned on the matter, neither the paternal aunt nor the paternal grandmother testified that the mother was a bad parent. Both testified that the mother had always made sure the children were clothed and fed. The paternal aunt testified that she had never witnessed the mother physically mistreating the children. The only stated basis for the paternal grandmother's opinion that the mother was unfit was her concern about the mother's having tested positive for methamphetamine.
Even considering the fact that the mother had been an involved and caring mother, *1231 we cannot agree that the evidence does not clearly and convincingly support a conclusion that the mother is unfit at this time. The mother's health problems appear to have resulted in what might be abuse of prescription medication and even the use of illegal substances. Even once her health problems had been resolved, the mother continued to have only minimal contact with her children until she was given visitation in the March 14, 2008, pendente lite order. She never once telephoned the paternal grandmother to check on Hunter. She failed to provide for the children's needs, keeping the benefits she received for the children instead of providing those benefits as financial assistance to the children's custodians. The mother's actions are inconsistent with the best interests of her children, and, thus, the trial court had a sufficient basis for its unfitness finding.
The mother next argues that the trial court erred in failing to find the custodians in contempt of court for failing to cooperate with the mother and for failing to keep the mother apprised of the children's medical and educational issues.
"[W]hether a party is in contempt of court is a determination committed to the sound discretion of the trial court, and, absent an abuse of that discretion or unless the judgment of the trial court is unsupported by the evidence so as to be plainly and palpably wrong, this court will affirm."
Stack v. Stack, 646 So.2d 51, 56 (Ala.Civ. App.1994); see also Hammock v. Hammock, 867 So.2d 355, 359-60 (Ala.Civ.App. 2003).
The mother argues that the trial court abused its discretion by not finding the custodians in contempt despite the evidence indicating that they had not included the mother in any of the decisions regarding the children's medical care or educational plans. The mother also pointed out that the custodians had failed to allow her additional or expanded visits despite her requests and that many telephone calls she placed to Trey were either forwarded or unanswered. The mother's accusations of contempt were not supported by evidence regarding specific incidents but instead consisted of largely generalized complaints regarding the custodians lack of cooperation.[1]
The paternal aunt testified that she had changed Trey's medications when the doctors had made the recommendation, and she admitted that she did not inform the mother when she took Trey to his regular doctor visits. Gravalee testified that the mother was not invited to the recent IEP meetings for the children because she understood that the mother did not have custodial rights; Gravalee did not testify from whom she received that information. The paternal grandmother testified that she did not think it was necessary to discuss Hunter's daily care with the mother.
The trial court determined that the custodians had not contemptuously disobeyed *1232 the trial court's pendente lite order. The evidence did not conclusively establish that the custodians had purposefully excluded the mother from any decisions regarding the children. Gravalee testified that she understood that the mother no longer had custody of the children; however, that evidence did not prove that the custodians had provided Gravalee the incorrect information regarding the mother's rights. Likewise, the mother's general complaints about not being apprised of the children's medical care do not support a conclusion that the custodians acted in violation of the pendente lite order by taking the children to doctor's appointments or by following the instructions or recommendations of the children's doctors. Finally, although the pendente lite order permitted the mother additional visitation at "mutually agreed upon times," the order did not require that the custodians allow additional visitation; thus, the mother's argument that the custodians violated the order by failing to provide additional or expanded visitation is not supported by the language in the order. We cannot agree that the trial court abused its discretion by failing to find the custodians in contempt.
The mother finally argues that the trial court did not have a compelling reason to separate the children, which, under former caselaw, was required when a trial court entered a custody order separating siblings. See A.B. v. J.B., 40 So.3d 723, 729 (Ala.Civ.App.2009). According to A.B., "our caselaw more accurately holds that siblings may be separated if the trial court concludes, based on sufficient evidence in the record, that the separation will serve the best interests of the children at issue." A.B., 40 So.3d at 729. The mother herself divided the children between the custodians, and the custodians have each performed admirably as caretakers for their respective charge. The fact that the children both have special needs, the fact that the testimony indicated that Hunter and the paternal grandmother shared a special bond, and the fact that the paternal aunt had been involved in assisting in Trey's care by taking him to physical therapy since before assuming custody in September 2007 would all support a conclusion that the children would be best cared for in the separate homes in which they had been living since September 2007. The trial court found that both children were doing very well in their respective homes. Thus, we cannot agree with the mother's contention that the trial court's judgment is faulty because it separated the siblings in this case.
The mother's request for an attorney fee on appeal denied.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
BRYAN, J., concurs in the result, without writing.
MOORE, J., concurs in part and dissents in part, with writing.
MOORE, Judge, concurring in part and dissenting in part.
I concur as to that portion of the main opinion affirming the judgment of the trial court insofar as it refused to hold the custodians of the children in contempt of court. I agree with the implied holding in the main opinion that the trial court had subject-matter jurisdiction over the custody dispute between the parties, but I dissent as to that portion of the main opinion affirming the judgment of the trial court insofar as it found the mother unfit and awarded custody of the children to the custodians.

*1233 Jurisdiction

Before addressing the substantive aspects of the judgment awarding custody of the children to the custodians, this court must first determine for itself whether that judgment supports an appeal. J.B. v. A.B., 888 So.2d 528 (Ala.Civ.App.2004). A judgment entered by a lower court without subject-matter jurisdiction is void and will not support an appeal. Id. The trial court, a circuit court, generally has subject-matter jurisdiction to enter a judgment resolving a child-custody dispute, see Ala. Const. 1901, Art. IV, § 142(b) (Official Recomp.) ("The circuit court shall exercise general jurisdiction in all cases except as may otherwise be provided by law."); however, a circuit court does not have subject-matter jurisdiction to adjudicate a dependency petition because, by statute, juvenile courts have exclusive jurisdiction over petitions in which the dependency of a child has been alleged. See former § 12-15-30(a), Ala. Code 1975.[2] Whether the trial court in this case, a circuit court, entered a valid judgment depends upon whether it adjudicated a pure custody dispute or purported to decide a controversy regarding the dependency of the children.
In March 2008, the custodians moved to intervene in the parents' pending divorce action and filed complaints in which they alleged, among other things, that they had acted as the de facto custodians of the children since September 2007, when the mother and the father had allegedly voluntarily relinquished custody to the custodians, and
"10. That both children are without a parent or guardian able to provide for the child's support, training or education.
"11. That the parents of the children are unable to discharge their responsibilities to and for them.
"12. That the children are without proper parental care and control necessary for the children's well being because of the faults or habits of the parents or their neglect or refusal, when able to do so to provide them."
The foregoing numbered allegations fall within the ambit of former § 12-15-1(10)b., k., and j.[3]
*1234 In J.W. v. N.K.M., 999 So.2d 526 (Ala. Civ.App.2008), a maternal great-aunt alleged in a petition filed in a juvenile court that she and other family members had long exercised proper custody and care over a child whose mother had abandoned the child and whose mother was unfit to resume custody of the child as the mother intended. 999 So.2d at 542. This entire court agreed that a child is alleged to be dependent only if, in addition to the circumstances set out in subsections a. through m. of former § 12-15-1(10), the child is also alleged to be "in need of care or supervision" as required by former § 12-15-1(10)n. 999 So.2d at 532. The majority reasoned that the maternal great-aunt's allegations, which tracked the language of former § 12-15-1(10)c., i., and j., along with the prayer that the child be declared dependent and that the child's custody be awarded to the maternal relatives implied that the child was "in need of care or supervision," so as to allege the dependency of the child and to confer subject-matter jurisdiction on the juvenile court. 999 So.2d at 533.
In this case, as in J.W., the custodians alleged facts tracking the language of the dependency statute and requested custody of the children, but, unlike in J.W., the custodians did not request that the children be declared dependent. However, the reasoning from J.W. suggests that the custodians, by seeking custody of the children, implied that the children were "in need of care or supervision" within the meaning of former § 12-15-1(10)n., which, when coupled with their allegations of parental unfitness under former § 12-15-1(10)b., k., and j., would amount to an implied allegation of dependency. If that is the case, then, consistent with J.W., only a juvenile court would have had subject-matter jurisdiction to adjudicate the complaints filed by the custodians.
I dissented in J.W. because I maintained that when a relative alleges that he or she has been exercising proper care and custody of a child and he or she is seeking a continuation of that custody due to the abandonment or unfitness of the child's parents, such allegations negate any implication that the child is "in need of care or supervision." 999 So.2d at 541-42. I maintained that those allegations do not state a claim that the child is dependent, but simply state a controversy over the future custody of the child, a dispute which falls within the subject-matter jurisdiction *1235 of our circuit courts. 999 So.2d at 542 (Moore, J., dissenting); see also T.T.T. v. R.H., 999 So.2d 544, 560-61 (Ala.Civ.App. 2008) (Moore, J., dissenting).
Consistent with my dissent in J.W., I construe the allegations contained in the complaints in intervention filed by the custodians as merely alleging a pure custody dispute. By alleging that they had been exercising de facto custody of the children for six months, and by claiming that the best interests of the children would be served by continuing that custody due to the unfitness of the parents and the voluntary relinquishment of the children's custody by the mother, the custodians implied that they were providing the children proper care and supervision, thereby negating any implication that the children were "in need of care or supervision" due to their parents' conduct and circumstances. Hence, the complaints do not constitute dependency petitions, which only a juvenile court could adjudicate; they allege a pure custody dispute, which the trial court, as a circuit court, had the authority to adjudicate.
I point out, however, that by acknowledging, without comment, that the custodians did not allege the dependency of the children, the majority silently contradicts the holding in J.W. I believe that contradiction will only confuse the bench and the bar regarding the proper jurisdictional line separating juvenile courts and circuit courts when faced with a custody dispute regarding children of allegedly unfit parents. I would resolve that dispute by overruling J.W. and similar cases and by holding that a complaint or petition in which a de facto custodian alleges that he or she is properly caring for a child due to the abandonment by, or unfitness of, a parent, and in which that custodian seeks a continuation of such custody, states a pure custody dispute that should be resolved by a circuit court.

Unfitness
The concept of "unfitness" has been rooted in our child-custody jurisprudence since at least 1860 when our supreme court stated:
"So strong is the presumption, that `the care which is prompted by the parental instinct, and responded to by filial affection, is most valuable of all'; and so great is the reluctance of the court to separate a child of tender years from those who according to the ordinary laws of human nature, must feel the greatest affection for it, and take the deepest interest in its welfare,  that the parental authority will not be interfered with, except in case of gross misconduct, or where, from some other cause, the parent wants either the capacity or the means for the proper nurture and training of the child. Where a contest for the custody of a child arises between its father or mother and a third person, the superior claim of the parent ought not, in our opinion, to be disturbed, unless it plainly appears that the interests of the child require it to be set aside. Whenever it is shown that the parent is guilty of gross ill-treatment or cruelty towards his infant children, or that his conduct or domestic associations are such that the children cannot associate with him without moral contamination, it is the duty of the court to interfere for their protection, and to appoint a suitable person to take care of them and superintend their education."
Striplin v. Ware, 36 Ala. 87, 89-90 (1860) (citations omitted). In Striplin, the court affirmed a judgment that refused to remove children from the custody of their natural mother and their stepfather because, the court held: "The evidence in this case is wholly insufficient to show that *1236 the mother is, either physically or mentally, incapable of taking proper care of these children." 36 Ala. at 90.
Over the years, our supreme court has only strengthened the principles set out in Striplin by requiring an express finding of unfitness, with such a finding to be premised on clear and convincing evidence. See, e.g., Ex parte A.R.S., 980 So.2d 401, 404 (Ala.2007); Ex parte Terry, 494 So.2d 628, 632-33 (Ala.1986); and Chandler v. Whatley, 238 Ala. 206, 208-09, 189 So. 751, 753-54 (1939). The appellate courts of this state have also recognized that the fitness of a parent must be measured by the parent's current circumstances. See Ex parte Phillips, 266 Ala. 198, 200, 95 So.2d 77, 79 (1957) ("`A finding of unfitness may be superseded by changed and improved conduct.'" (quoting Lockard v. Lockard, 102 N.E.2d 747, 748, 63 Ohio Law Abs. 549 (Ct. Of Common Pleas 1951))); Edwards v. Sessions, 254 Ala. 522, 524, 48 So.2d 771, 772 (1950) ("The mother has made mistakes, grievous mistakes, but this should not be sufficient to take the child from the mother if the mother shows indications of becoming a good mother and is presently able reasonably to care for the child."); and Borsdorf v. Mills, 49 Ala.App. 658, 661-62, 275 So.2d 338, 340-41 (Civ.App. 1973). Today, a child may be removed from the custody of a natural parent when a trial court expressly finds that a nonparent has established by clear and convincing evidence that the parent is currently unfit to properly care for the child.[4]Ex parte Terry, 494 So.2d at 632-33. However, the substantive meaning of the term "unfitness" carries with it the same connotation that it did at the time the opinion in Striplin was released  an inability or unwillingness on the part of a parent to provide properly for the needs of his or her children for food, clothing, shelter, medical care, education, nurturing, and protection.
I cannot concur that the trial court reasonably could have been clearly convinced from the evidence presented by the custodians that the mother currently demonstrates an inability or unwillingness to properly meet the needs of her children. The evidence is undisputed that, until her illnesses, the mother provided not only proper, but exemplary, care for these two children with special needs, often without financial aid or other aid from the father. The mother staved off her own medical requirements while properly caring for the children. When finally succumbing to the need for medical care, the mother arranged for the children to be properly cared for by the custodians. All of those actions strongly evidence a concerned and nurturing mother.
Admittedly, during her illnesses, the mother made some poor choices  most notably, misrepresenting her condition to the paternal aunt and failing to consistently visit with the children while she was convalescing. However, the evidence does not suggest that the mother swindled the children out of their Social Security benefits. The evidence is undisputed that the mother offered to provide support for the children but that the custodians refused it, and the mother testified without contradiction or impeachment that she either saved the money or used it for bills or items for the children. The only real evidence *1237 as to the mother's suspected illegal-drug abuse consists of one positive methamphetamine test, which had not been duplicated. Even the evidence implying that the mother may have abused legal drugs is not coupled with any evidence indicating that such alleged abuse impaired the ability of the mother to care for her children. See Wester v. Wester, 500 So.2d 1106, 1107 (Ala.Civ.App.1986) (implying that illegal-drug use that has not been shown to have a detrimental impact on children will not in itself justify a change of custody). In fact, the evidence shows that the mother's third child, an infant, was returned to the mother's custody by the local department of human resources and remained in her care after the suspicious drug-test results. It seems incongruent for a state court to find that the mother is unfit to have the custody of the two children at issue, for whom she has demonstrated a capability to meet their special needs, while a state agency specializing in the protection of the welfare of children recognizes the mother's fitness to raise her third child with her live-in paramour.
It also defies logic that the mother was deemed unfit by the trial court yet was given unsupervised visitation with the children from Friday at 6:00 p.m. to Sunday at 6:00 p.m. every other weekend, along with unsupervised visitation on certain holidays, during spring break, for three weeks during the summer, and at all other times to which the parties mutually agree. That judgment results in an "unfit" parent exercising unrestricted custody of the children for a minimum of 93 days a year. As this court noted in Slaton v. Slaton, 682 So.2d 1056, 1058 (Ala.Civ.App.1996), "[d]uring a period of unsupervised visitation, the noncustodial parent becomes the person solely responsible for the child's safety and welfare." Thus, in fashioning a visitation award, "the trial court should consider whether the noncustodial parent is fit to care for the child during the visitation." Id. The visitation provision of the judgment in this case reads exactly like any divorce judgment in which a trial court concludes that the custodial parent should exercise primary physical custody but that the noncustodial parent should have liberal contact with the children. Such judgments are based on the assumption that both parents are fit, and the decision as to primary physical custody rests solely on the best interests of the child. By awarding the mother such visitation rights, the trial court obviously must not have been clearly convinced from the evidence of any real safety concerns regarding the children that would justify preventing the mother from exercising their custody for extended periods. See Ex parte G.C., 924 So.2d 651, 672 (Ala.2005) (Lyons, J., concurring in part and dissenting in part) ("Indeed, under the trial court's order, the father was awarded very specific and liberal unsupervised visitation with the child, certainly an anomalous result if he is so unfit.").
That the mother is presently willing to care for her children cannot be disputed. That she did for years admirably perform her parental duties appears beyond question. Could the evidence regarding the mother's behavior during the six months that she allowed the custodians to care for her children clearly convince a reasonable fact-finder that the mother is unable to assume that same level of care? I think not. I believe the evidence is insufficient to support a finding that the mother is presently unfit, and I construe the visitation provisions of the judgment of the trial court as revealing its own misgivings regarding its finding of unfitness; therefore, I would reverse the judgment and instruct the trial court to award custody of the children to the mother. Because a majority of the court disagrees, I respectfully *1238 dissent.[5]
NOTES
[1] To the extent the mother sought a finding of criminal contempt to punish the custodians, see Rule 70A(a)(2)(C)(ii), Ala. R. Civ. P. ("`Criminal contempt' means . . . [w]illful disobedience or resistance of any person to a court's lawful writ, subpoena, process, order, rule, or command, where the dominant purpose of the finding of contempt is to punish the contemnor."), and Ex parte King, 263 Ala. 487, 490, 83 So.2d 241, 244 (1955) ("`A criminal contempt is one in which the purpose of the proceeding is to impose punishment for disobedience to the orders of the court.'" (quoting Ex parte Hill, 229 Ala. 501, 503, 158 So. 531, 532 (1935))), we note that "to support a finding of criminal contempt, the contemptuous actions must be specific and identifiable." K.T.W.P. v. D.R.W., 721 So.2d 699, 702 (Ala.Civ.App.1998).
[2] Section 12-15-30(a) has been amended and renumbered as § 12-15-114(a), Ala.Code 1975, which provides, in pertinent part: "A juvenile court shall exercise exclusive original jurisdiction of juvenile court proceedings in which a child is alleged to have committed a delinquent act, to be dependent, or to be in need of supervision." See Act No. 2008-277, § 3, Ala. Acts 2008 (effective January 1, 2009). However, former § 12-15-30(a) applied at the time of the filing of the complaints in intervention.
[3] At the time the custodians filed their complaints in intervention, former § 12-15-1(10), Ala.Code 1975, defined a "dependent child" as a child:

"a. Who, for any reason is destitute, homeless, or dependent on the public for support; or
"b. Who is without a parent or guardian able to provide for the child's support, training, or education; or
"c. Whose custody is the subject of controversy; or
"d. Whose home, by reason of neglect, cruelty, or depravity on the part of the parent, parents, guardian, or other person in whose care the child may be, is an unfit and improper place for the child; or
"e. Whose parent, parents, guardian, or other custodian neglects or refuses, when able to do so or when such service is offered without charge, to provide or allow medical, surgical, or other care necessary for the child's health or well-being; or
"f. Who is in a condition or surroundings or is under improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child; or
"g. Who has no proper parental care or guardianship; or
"h. Whose parent, parents, guardian, or custodian fails, refuses, or neglects to send the child to school in accordance with the terms of the compulsory school attendance laws of this state; or
"i. Who has been abandoned by the child's parents, guardian, or other custodian; or
"j. Who is physically, mentally, or emotionally abused by the child's parents, guardian, or other custodian or who is without proper parental care and control necessary for the child's well-being because of the faults or habits of the child's parents, guardian, or other custodian or their neglect or refusal, when able to do so, to provide them; or
"k. Whose parents, guardian, or other custodian are unable to discharge their responsibilities to and for the child; or
"l. Who has been placed for care or adoption in violation of the law; or
"m. Who for any other cause is in need of the care and protection of the state; and
"n. In any of the foregoing, is in need of care or supervision."
By Act No. 2008-277, Ala. Acts 2008, the provisions of the former Alabama Juvenile Justice Act, § 12-15-1 et seq., Ala.Code 1975, were either repealed or amended, renumbered, and incorporated into the current Alabama Juvenile Justice Act ("the AJJA"), § 12-15-101 et seq., Ala.Code 1975. Former § 12-15-1(10) has been amended and renumbered as § 12-15-102(8), Ala.Code 1975. The effective date of the AJJA is January 1, 2009; therefore, § 12-15-102(8) is not applicable to this case.
[4] Under Ex parte Terry, a parent also may lose custody to a nonparent if the parent has voluntarily forfeited custody of the child. 494 So.2d at 632. In this case, the trial court found that the mother had not voluntarily forfeited her custodial rights by allowing the custodians to assume the care of the children during her illnesses. The custodians did not file a cross-appeal as to that finding, so it is now the law of the case that the mother did not voluntarily forfeit her rights to the custody of the children. See generally Norandal, U.S.A., Inc. v. Graben, 18 So.3d 405, 410 (Ala.Civ.App.2009).
[5] Because I would reverse the custody aspects of the judgment, I pretermit any discussion of the mother's argument that the trial court erred in separating the children.